**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1713
_____

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association;
NATIONAL BASKETBALL ASSOCIATION, a joint
venture;
NATIONAL FOOTBALL LEAGUE, an unincorporated
association;
NATIONAL HOCKEY LEAGUE, an unincorporated
association;
OFFICE OF THE COMMISSIONER OF BASEBALL, an
unincorporated association doing business as MAJOR
LEAGUE BASEBALL;

UNITED STATES OF AMERICA (Intervenor in the District
Court)

v.

GOVERNOR OF THE STATE OF NEW JERSEY;
DAVID L. REBUCK, Director of the New Jersey Division of
Gaming Enforcement
and Assistant Attorney General of the State of New Jersey;
FRANK ZANZUCCKI, Executive Director of the New
Jersey Racing Commission

NEW JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC.; STEPHEN M. SWEENEY; SHEILA
Y. OLIVER (Intervenors in District Court)

Stephen M. Sweeney and Sheila Y. Oliver,
Appellants

_____

No. 13-1714
_____


NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association;
NATIONAL BASKETBALL ASSOCIATION, a joint
venture;
NATIONAL FOOTBALL LEAGUE, an unincorporated
association;
NATIONAL HOCKEY LEAGUE, an unincorporated
association;
OFFICE OF THE COMMISSIONER OF BASEBALL, an
unincorporated association doing business as MAJOR
LEAGUE BASEBALL;

UNITED STATES OF AMERICA (Intervenor in the District
Court)

v.

GOVERNOR OF THE STATE OF NEW JERSEY;

2

DAVID L. REBUCK, Director of the New Jersey Division of
Gaming Enforcement
and Assistant Attorney General of the State of New Jersey;
FRANK ZANZUCCKI, Executive Director of the New
Jersey Racing Commission

NEW JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC.; STEPHEN M. SWEENEY; SHEILA
Y. OLIVER (Intervenors in District Court)

New Jersey Thoroughbred Horsemen's Association, Inc.,
Appellant

_____

No. 13-1715
_____

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association;
NATIONAL BASKETBALL ASSOCIATION, a joint
venture;
NATIONAL FOOTBALL LEAGUE, an unincorporated
association;
NATIONAL HOCKEY LEAGUE, an unincorporated
association;
OFFICE OF THE COMMISSIONER OF BASEBALL, an
unincorporated association doing business as MAJOR
LEAGUE BASEBALL;

UNITED STATES OF AMERICA (Intervenor in the District
Court)

3

v.

GOVERNOR OF THE STATE OF NEW JERSEY;
DAVID L. REBUCK, Director of the New Jersey Division of
Gaming Enforcement
and Assistant Attorney General of the State of New Jersey;
FRANK ZANZUCCKI, Executive Director of the New
Jersey Racing Commission

NEW JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC.; STEPHEN M. SWEENEY; SHEILA
Y. OLIVER (Intervenors in District Court)

Governor of the State of New Jersey; David L. Rebuck and
Frank Zanzuccki,
Appellants

_____

On Appeal from the United States District Court
for the District of New Jersey
(Civil Action No. 3-12-cv-04947)
District Judge: Hon. Michael A. Shipp

_____

Argued: June 26, 2013

Before: FUENTES, FISHER, and VANASKIE, *Circuit
Judges*.

(Opinion Filed:  September 17, 2013)

4

Theodore B. Olson, Esq. **[ARGUED]**
Matthew D. McGill, Esq.
Ashley E. Johnson, Esq.
Robert E. Johnson, Esq.
Gibson Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W., 9th Floor
Washington, DC 20036

John J. Hoffman, Esq.
Christopher S. Porrino, Esq.
Stuart M. Feinblatt, Esq.
Peter M. Slocum, Esq.
Office of the Attorney General of the State of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

*Attorneys for Appellants Governor of the State of New Jersey,
David L. Rebuck, Director of the New Jersey Division of
Gaming Enforcement, and Frank Zanzuccki, Executive
Director of the New Jersey Racing Commission*

Michael R. Griffinger, Esq. **[ARGUED]**
Thomas R. Valen, Esq.
Jennifer A. Hradil, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

*Attorneys for Intervenors Stephen Sweeney and Sheila Oliver*

5

Ronald J. Riccio, Esq. **[ARGUED]**
Eliot Berman, Esq.
McElory, Deutsch, Mulvaney & Carpenter LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962

*Attorneys for Intervenor New Jersey Thoroughbred
Horsemen's Association, Inc.*


Paul D. Clement, Esq. **[ARGUED]**
Candice Chiu, Esq.
William R. Levi, Esq.
Erin E. Murphy, Esq.
Bancroft PLLC
1919 M Street N.W. Suite 470
Washington, DC 20036

William J. O'Shaughnessy, Esq.
Richard Hernandez, Esq.
McCarter & English LLP
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102

Jeffrey A. Mishkin, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036

*Attorneys for Appellees National Collegiate Athletic
Association, National Basketball Association, National*

*Football League, National Hockey League, and Office of the Commissioner of Baseball d/b/a Major League Baseball*

Paul J. Fishman, Esq.  **[ARGUED]**
Office of the United States Attorney
District of New Jersey
970 Broad Street, Room 700
Newark, NJ 07102

Peter J. Phipps, Esq.
Scott McIntosh, Esq.
United States Department of Justice
Civil Division
P.O. Box 883
Ben Franklin Station
Washington, DC 20044

*Attorneys for Intervenor United States of America*

Christopher S. Dodrill, Esq.
Elbert Lin, Esq.
Attorney General of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305

*Attorneys for Amici Curiae States of West Virginia, Georgia, and Kansas, and the Commonwealth of Virginia in Support of Appellants and Reversal*

———————————

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Betting on sports is an activity that has unarguably increased in popularity over the last several decades. Seeking to address instances of illegal sports wagering within its borders and to improve its economy, the State of New Jersey has sought to license gambling on certain professional and amateur sporting events. A conglomerate of sports leagues, displeased at the prospect of State-licensed gambling on their athletic contests, has sued to halt these efforts. They contend, alongside the United States as intervening plaintiff, that New Jersey's proposed law violates a federal law that prohibits most states from licensing sports gambling, the Professional and Amateur Sports Protection Act of 1992 (PASPA), 28 U.S.C. § 3701 *et seq*.

In defense of its own sports wagering law, New Jersey counters that the leagues lack standing to bring this case because they suffer no injury from the State's legalization of wagering on the outcomes of their games. In addition, alongside certain intervening defendants, New Jersey argues that PASPA is beyond Congress' Commerce Clause powers to enact and that it violates two important principles that underlie our system of dual state and federal sovereignty: one known as the "anti-commandeering" doctrine, on the ground that PASPA impermissibly prohibits the states from enacting legislation to license sports gambling; the other known as the "equal sovereignty" principle, in that PASPA permits Nevada to license widespread sports gambling while banning other states from doing so. The District Court disagreed with each of these contentions, granted summary judgment to the leagues, and enjoined New Jersey from licensing sports betting.

On appeal, we conclude that the leagues have Article III standing to enforce PASPA and that PASPA is constitutional.  As will be made clear, accepting New Jersey's arguments on the merits would require us to take several extraordinary steps, including: invalidating for the first time in our Circuit's jurisprudence a law under the anti-commandeering principle, a move even the United States Supreme Court has only twice made; expanding that principle to suspend commonplace operations of the Supremacy Clause over state activity contrary to federal laws; and making it harder for Congress to enact laws pursuant to the Commerce Clause if such laws affect some states differently than others.

We are cognizant that certain questions related to this case—whether gambling on sporting events is harmful to the games' integrity and whether states should be permitted to license and profit from the activity—engender strong views. But we are not asked to judge the wisdom of PASPA or of

New Jersey's law, or of the desirability of the activities they seek to regulate. We speak only to the legality of these measures as a matter of constitutional law. Although this "case is made difficult by [Appellants'] strong arguments" in support of New Jersey's law as a policy matter, *see Gonzales v. Raich*, 545 U.S. 1, 9 (2005), our duty is to "say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177 (1803). "If two laws conflict with each other, the courts must decide on the operation of each." *Id.* New Jersey's sports wagering law conflicts with PASPA and, under our Constitution, must yield. We will affirm the District Court's judgment.

## I. LEGAL FRAMEWORK

Wagering on sporting events is an activity almost as inscribed in our society as participating in or watching the sports themselves. New Jersey tells us that sports betting in the United States—most of it illegal—is a $500 billion dollar per year industry. And scandals involving the rigging of

sporting contests in the interest of winning a wager are as old as the games themselves: the infamous Black Sox scandal of the 1919 World Series, or Major League Baseball's ("MLB") lifetime ban on all-time hits leader Pete Rose for allegedly wagering on games he played in come to mind.  And the recent prosecution of Tim Donaghy, a National Basketball Association ("NBA") referee who bet on games that he officiated, reminds us of problems that may stem from gambling.

However, despite its pervasiveness, few states have ever licensed gambling on sporting events.  Nevada alone began permitting widespread betting on sporting events in 1949 and just three other states—Delaware, Oregon, and Montana—have on occasion permitted limited types of lotteries tied to the outcome of sporting events, but never single-game betting.  Sports wagering in all forms, particularly State-licensed wagering, is and has been illegal

elsewhere. *See, e.g.*, 18 Pa. Cons. Stat. Ann. § 5513; Del. Code Ann. tit. 11, § 1401, *et seq.* Congress took up and eventually enacted PASPA in 1992 in response to increased efforts by states to begin licensing the practice.

**A.      The Professional and Amateur Sports Protection Act of 1992**

PASPA's key provision applies for the most part identically to "States" and "persons," providing that neither may

> sponsor, operate, advertise, or promote . . . a lottery, sweepstakes, or other betting, gambling, or wagering scheme based directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702. The prohibition on private persons is limited to any such activity conducted "pursuant to the law or compact of a governmental entity," *id.* § 3702(2), while the

13

states are subject to an additional restriction: they may not "license[] or authorize by law or compact" any such gambling activities, *id.* §§ 3702(1), 3701.

PASPA contains three relevant exceptions—a "grandfathering" clause that releases Nevada from PASPA's grip, *see id.* § 3704(a)(2), a clause that permitted New Jersey to license sports wagering in Atlantic City had it chosen to do so within one year of PASPA's enactment, *see id*. § 3704(a)(3), and a grandfathering provision permitting states like Delaware and Oregon to continue the limited "sports lotteries" that they had previously conducted, *see id.* § 3704(a)(1). PASPA provides for a private right of action "to enjoin a violation [of the law] . . . by the Attorney General or by a . . . sports organization . . . whose competitive game is alleged to be the basis of such violation." *Id.* § 3703.

Only one Court of Appeals has decided a case under PASPA—ours. In *Office of the Commissioner of Baseball v.*

14

*Markell* we held that PASPA did not permit Delaware to license single-game betting because the relevant grandfathering provision for Delaware permitted only lotteries consisting of multi-game parlays on NFL teams. 579 F.3d 293, 304 (3d Cir. 2009). This is the first case addressing PASPA's constitutionality.

The Act's legislative history is sparse but mostly consistent with the foregoing. The Report of the Senate Judiciary Committee makes clear that PASPA's purpose is to "prohibit sports gambling conducted by, or authorized under the law of, any State or governmental entity" and to "stop the spread of State-sponsored sports gambling." Sen. Rep. 102-248, at 4, *reprinted in* 1992 U.S.C.C.A.N. 3553, 3555 ("Senate Report"). The Senate Report specifically notes legislators' concern with "State-sponsored" and "State-sanctioned" sports gambling. *Id.* at 3555.

The Senate Report catalogues what the Committee believed were some of the problems arising from sports gambling. Importantly, the Committee noted its concern for "the integrity of, and public confidence in, amateur and professional sports" and its concern that "[w]idespread legalization of sports gambling would inevitably promote suspicion about controversial plays and lead fans to think 'the fix was in' whenever their team failed to beat the point-spread." *Id.* at 3556. The Senate Report also stated its concurrence with the then-director of New Jersey's Division of Gaming Enforcement's statement that "most law enforcement professionals agree that legalization has a negligible impact on, and in some ways enhances, illegal markets." *Id.* at 3558. This is so because "many new gamblers will . . . inevitably . . . seek to move beyond lotteries to wagers with higher stakes and more serious consequences." *Id.*

16

The Senate Report also explains the Committee's conclusion that "[s]ports gambling is a national problem" because "[t]he moral erosion it produces cannot be limited geographically" given the thousands who earn a livelihood from professional sports and the millions who are fans of them, and because "[o]nce a State legalizes sports gambling, it will be extremely difficult for other States to resist the lure." *Id.* at 3556. Finally, it notes that PASPA exempts Nevada because the Committee did not wish to "threaten [Nevada's] economy," or of the three other states that had chosen in the past to enact limited forms of sports gambling. *Id.* at 3559.

**B.** **Sports Gambling in New Jersey Since PASPA Was Enacted**

Although New Jersey in its discretion chose not to avail itself of PASPA's exemption within the one-year window, "[o]ver the course of the next two decades . . . the

17

views of the New Jersey voters regarding sports wagering evolved." Br. of Appellants Sweeney, *et al.* 4. In 2010, the New Jersey Legislature held public hearings during which it heard testimony that regulated sports gambling would generate much-needed revenues for the State's casinos and racetracks, and during which legislators expressed a desire to "to stanch the sports-wagering black market flourishing within [New Jersey's] borders." Br. of Appellants Christie, *et al.* 13 ("N.J. Br."). The Legislature ultimately decided to hold a referendum which would result in an amendment to the State's Constitution permitting the Legislature to "authorize by law wagering. . . on the results of any professional, college, or amateur sport or athletic event." N.J. Const. Art. IV, § VII, ¶ 2 (D), (F). The measure was approved by the voters, and the Legislature later enacted the law that is now asserted to be in violation of PASPA—the "Sports Wagering Law," which permits State authorities to license sports

18

gambling in casinos and racetracks and casinos to operate "sports pools." N.J.S.A. 5:12A-1 *et seq.*; *see also* N.J.A.C. § 13:69N-1.1 *et seq.* (regulations implementing the law).

## II. PROCEDURAL HISTORY

The NBA, MLB, the National Collegiate Athletic Association ("NCAA"), the National Football League ("NFL"), and the National Hockey League ("NHL") (collectively, the "Leagues"), sued New Jersey Governor Chris Christie, New Jersey's Racing Commissioner, and New Jersey's Director of Gaming Enforcement (the "State" or "New Jersey"), under 28 U.S.C. § 2703, asserting that the Sports Wagering Law is invalidated by PASPA. The New Jersey Senate Majority Leader Stephen Sweeney and House Speaker Sheila Oliver intervened as defendants, alongside the New Jersey Thoroughbred Horsemen's Association, the owner of the Monmouth Park Racetrack, a business where

19

sports gambling would occur under the Sports Wagering Law (the "NJTHA") (collectively, "Appellants").

The State moved to dismiss for lack of standing and the District Court ordered expedited discovery on that question. After the completion of discovery and oral arguments, the District Court concluded that the Leagues have standing. *Nat'l Collegiate Athletic Ass'n v. Christie*, No. 12-4947, 2012 WL 6698684 (D.N.J. Dec. 21, 2012) ("*NCAA I*").

With the constitutionality of PASPA then squarely at issue, the District Court invited the United States to intervene pursuant to 28 U.S.C. § 2403. The District Court ultimately upheld PASPA's constitutionality, granted summary judgment to the Leagues, and enjoined the Sports Wagering Law from going into effect. *Nat'l Collegiate Athletic Ass'n v. Christie*, __ F. Supp. 2d __, 2013 WL 772679 (D.N.J. Feb. 28, 2013) ("*NCAA II*"). This expedited appeal followed.

### III. JURISDICTION: WHETHER THE LEAGUES HAVE STANDING

The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, and we have appellate jurisdiction over its final judgment under § 1291. Our jurisdiction, however, is limited by the Constitution's "cases" and "controversies" requirement. U.S. CONST., art. III, § 2. To satisfy this jurisdictional limitation, the party invoking federal court authority must demonstrate that he or she has standing to bring the case.[1]

The Leagues argue they have standing because their own games are the subject of the Sports Wagering Law. They also contend that the law will increase the total amount

---

[1] The United States notes there may be questions as to whether the District Court's injunction is an appealable final order because it does not specify what steps the State must undertake to comply with the injunction, but we conclude that the injunction is an appealable final order because the merits opinion describes what the State must do—refrain from licensing sports gambling. *See NCAA II*, 2013 WL 772679, at *25.

of gambling on sports available, thereby souring the public's perception of the Leagues as people suspect that games are affected by individuals with a perhaps competing hidden monetary stake in their outcome. Appellants counter that the Leagues cannot show a concrete, non-speculative injury from any potential increase in *legal* gambling.

The District Court granted summary judgment to the Leagues, reasoning that *Markell* supports a holding that the Leagues have standing, and that reputational injury is a legally cognizable harm that may confer standing. It also found sufficient facts in the record to conclude that the Sports Wagering Law will result in an increase in fans' negative perceptions of the Leagues. We review *de novo* the legal conclusion that the Leagues have standing, and we review for clear error any factual findings underlying the District Court's determination. *Marion v. TDI Inc.*, 591 F.3d 137, 146 (3d Cir. 2010).

22

## A. The Effect of *Markell*

*Markell*, like this case, was a lawsuit by the Leagues to stop a state from licensing single-game betting on the outcome of sporting events. In *Markell* we "beg[a]n [our analysis], as always, by considering whether we ha[d] jurisdiction to hear [the] appeal," and later concluded that we did have jurisdiction. 579 F.3d at 297, 300. But, contrary to the Leagues' suggestion, our analysis was limited to whether we had appellate jurisdiction under 28 U.S.C. § 1292(a). *See id.* We did not explicitly consider Article III standing, and a "drive-by jurisdictional ruling, in which jurisdiction has been assumed by the parties . . . does not create binding precedent." *United States v. Stoerr*, 695 F.3d 271, 277 n.5 (3d Cir. 2012) (internal quotation marks and alterations omitted). Therefore, we will not rely on *Markell* for our standing analysis.

## B. Standing Law Generally

Under the familiar three-part test, to establish standing, a plaintiff must show (1) an "injury in fact," *i.e.*, an actual or imminently threatened injury that is "concrete and particularized" to the plaintiff; (2) causation, *i.e.*, traceability of the injury to the actions of the defendant; and (3) redressability of the injury by a favorable decision by the Court. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Causation and redressability may be met when "a party . . . challenge[s] government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940-41 (D.C. Cir. 2004). Here, the Leagues do not purport to enjoin third parties from attempting to fix games. The Leagues have sued to block the Sports Wagering Law, which they assert will result in a taint upon their games, and is a law that by

definition constitutes state action to license conduct that would not otherwise occur. Under the reasoning of *National Wrestling Coaches*, causation and redressability are thus satisfied, and all arguments implicitly aimed at those two prongs are suspect.

Accordingly, we focus on the injury-in-fact requirement, the "contours of [which], while not precisely defined, are very generous." *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982). Indeed, all that Article III requires is an identifiable trifle of injury, *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 690 n.14 (1973), which may exist if the plaintiff "has . . . a personal stake in the outcome of [the] litigation." *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992) (noting that to satisfy the injury-in-fact requirement the "injury must affect the plaintiff in a personal and individual

25

way"). To meet this burden, the Leagues must present evidence "in the same way as [for] any other matter on which [they] bear[] the burden of proof." *Lujan*, 504 U.S. at 561.

**C.** **Whether the Sports Wagering Law Causes the Leagues An Injury In Fact**

As noted, the Leagues offer two independent bases for standing: that the Sports Wagering Law makes the Leagues' games the object of state-licensed gambling and that they will suffer reputational harm if such activity expands. We address each in turn.

**1.** **The Leagues are essentially the object of the Sports Wagering Law**

Injury in fact may be established when the plaintiff himself is the object of the action at issue. *Id*. Thus, the Leagues are correct that if the Sports Wagering Law is directed at them, the injury-in-fact requirement is satisfied.

Fairly read, however, the Sports Wagering Law does not directly regulate the Leagues, but instead regulates the activities that may occur at the State's casinos and racetracks. We thus hesitate to conclude that the Leagues may rely solely on the existence of the Sports Wagering Law to show injury. But that is not to say that we are glib with respect to one of the main purposes of the law: to use the Leagues' games for profit. *Cf. NFL v. Governor of Del.*, 435 F. Supp. 1372, 1378 (D. Del. 1972) (Stapleton, J.) (explaining that Delaware's sports lottery sought to use the NFL's "schedules, scores and public popularity" to "mak[e] profits [Delaware] [c]ould not make but for the existence of the NFL"). The Sports Wagering Law is thus, in a sense, as much directed at the Leagues' events as it is aimed at the casinos. This is not a generalized grievance like those asserted by environmental groups over regulation of wildlife in cases where the Supreme Court has found no standing, such as in *Lujan* or *Summers*.

The law here aims to license private individuals to cultivate the fruits of the Leagues' labor.

Appellants counter that the Leagues' interest in not seeing their games subject to wagering is a non-cognizable "claim for the loss of psychic satisfaction." N.J. Br. at 31 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)). But the holding in *Steel Company* was that a claim for psychic satisfaction did not present a *redressable* injury. In that case, a private plaintiff sought a payment into the U.S. Treasury by a private company that had violated federal law, and asserted that such was a redressable injury because the plaintiff would feel "psychic satisfaction" in seeing the payment made. *See Steel Co.*, 523 U.S. at 107. The case is thus inapposite here, where redressability is established because the Leagues assert harm from the very government action they seek to enjoin—the enforcement of the Sports Wagering Law. Moreover, the Leagues do not

28

assert merely psychic, but reputational harm, a very real and very redressable injury.

Appellants also argue that because the Leagues do not have a proprietary interest in the outcomes of their games they may not seek to prevent others from profiting from them. This contention relies on the holding in *NFL v. Governor of Delaware*, that a Delaware lottery based on the outcome of NFL games did not constitute a misappropriation of the NFL's property. 435 F. Supp. at 1378-79. But here the Leagues do not complain of an invasion of any proprietary interest, but only refer to the fact of appropriation of their labor to show that the Sports Wagering Law is directed at them.

### 2. Reputational Harm as Injury In Fact

The Leagues may also meet their burden of establishing injury from a law aimed at their games by proving that the activity sanctioned by that law threatens to

cause them reputational harm amongst their fans and the public.

### (a) Reputation Harm Is a Legally Cognizable Injury

As a matter of law, reputational harm is a cognizable injury in fact. The Supreme Court so held in *Meese v. Keene*, where it concluded that a senator who wished to screen films produced by a foreign company had standing to challenge a law requiring the identification of such films as foreign "political propaganda" because the label could harm his reputation with the public and hurt his chances at reelection. 481 U.S. 465, 473-74 (1987). Essentially, the senator challenged his unwanted association with an undesirable label. Our cases have also recognized that reputational harm is an injury sufficient to confer standing. *See, e.g.*, *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 542-43 (3d Cir. 2007) (concluding that an attorney has standing to challenge a

public reprimand because the sanction "affect[s] [his] reputation"); *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 153 (3d Cir. 1999) (holding that a student had standing to challenge a rule requiring that he be identified as disabled because such label could sour the perception of him by "people who can affect his future and his livelihood").

The Leagues' claim of injury is identical to that of the plaintiffs in *Keene* and *Doe*: they are harmed by their unwanted association with an activity they (and large portions of the public) disapprove of—gambling. Appellants do not dispute this legal premise, but attack the strength of the evidence that the Leagues have proffered to tie the Sports Wagering Law to the reputational harm they assert. These arguments overstate what the Leagues must show to demonstrate reputational harm in this context and, in any case, ignore the strength of the proffered evidence.

### (b) The Evidence In the Record Supports the District Court's Conclusion that Reputational Harm Will Occur

To be sure, at the summary judgment stage, mere allegations of harm are insufficient and specific facts are required. *See Lujan*, 504 U.S. at 561. And a plaintiff's claim of fear of reputational harm must always be "based in reality." *Doe*, 199 F.3d at 153. But the "nature and extent of facts that must be averred" depends on the nature of the asserted injury. *Lujan*, 504 U.S. at 561-62. No one would doubt, for example, that an individual forced to wear a scarlet "A" on her clothing has standing to challenge that action based on reputational harm. Indeed, that was the import of our holding in *Doe* where, after discounting all of the evidence presented to prove that others' perception of the plaintiff as disabled could harm him, we concluded that his fear of reputational harm based on an unwanted and stigmatizing label was nevertheless based "in reality." 199

F.3d at 153. In *Keene*, by contrast, where the reputational harm from being associated with "foreign political propaganda" was not as intuitive, the Supreme Court held that an undisputed expert opinion that such labels may stigmatize individuals was sufficient to make the required injury-in-fact showing. 481 U.S. at 490. This suggests a spectrum wherein the sufficiency of the showing that must be made to establish reputational harm depends on the circumstances of each case. Here, the reputational harm that results from increasingly associating the Leagues' games with gambling is fairly intuitive.

For one, the conclusion that there is a link between legalizing sports gambling and harm to the integrity of the Leagues' games has been reached by several Congresses that have passed laws addressing gambling and sports, *see, e.g.*, H.R. Rep. No. 88-1053 (1963) (noting that when gambling interests are involved, the "temptation to fix games has

become very great," which in turn harms the honesty of the games); Senate Report at 3555 (noting that PASPA was necessary to "maintain the integrity of our national pastime"). It is, indeed, the specific conclusion reached by the Congress that enacted PASPA, as reflected by the statutory cause of action conferred to the Leagues to enforce the law when their individual games are the target of state-licensed sports wagering. *See* 28 U.S.C. § 3703. And, presumably, it has also been at least part of the conclusions of the various state legislatures that have blocked the practice throughout our history.

But even if polls like in *Keene* were always required in reputational harm cases, the Leagues have met that burden. The record is replete with evidence showing that being associated with gambling is stigmatizing, regardless of whether the gambling is legal or illegal. Before the District Court were studies showing that: (1) some fans from each

34

League viewed gambling as a problem area for the Leagues, and some fans expressed their belief that game fixing most threatened the Leagues' integrity [**App. 1605-06**]; (2) some fans did not want a professional sports franchise to open in Las Vegas, and some fans would be less likely to spend money on the Leagues if that occurred; and (3) a large number of fans oppose the expansion of legalized sports betting. **[2293-98.]** This more than suffices to meet the Leagues' evidentiary burden under *Keene* and *Doe*—being associated with gambling is undesirable and harmful to one's reputation.

Although the Leagues could end their injury in fact proffer there, they also set forth evidence establishing a clear link between the Sports Wagering Law and increased incentives for game-rigging. First, the State's own expert noted that state-licensing of sports gambling will result in an increase in the total amount of (legal plus illegal) gambling

35

on sports.  **[App. 325].**   Second, a report by the National Gambling Impact Study Commission, prepared at the behest of Congress in 1999, explains that athletes are "often tempted to bet on contests in which they participate, undermining the integrity of sporting contests."  App. 743.  Third, there has been at least one instance of match-fixing for NCAA games as a result of wagers placed through legitimate channels, and several as a result of wagers placed in illegal markets for most of the Leagues, and NCAA players have affected or have been asked to affect the outcome of games "because of gambling debt."  App. 2245.  Thus, more legal gambling leads to more total gambling, which in turn leads to an increased incentive to fix or attempt to fix the Leagues' matches.

This evidence, together, permits the factual conclusion that being associated with gambling is a stigmatizing label and that, to the extent that the Sports Wagering Law will

36

increase the total amount of gambling as New Jersey's expert

expects, it will increase some fans' "negative perceptions [of

the Leagues] attributed to game fixing and gambling." *NCAA

I*, 2013 WL 6698684, at *6. We discern no clear error in the

District Court's factual conclusions as derived from these

surveys and reports.[2]

### 3.  Appellants' Counterarguments

Appellants posit that the Leagues cannot establish

injury based on any stigma that may attach to wagering,

because fans would not think negatively of the Leagues given

---

[2]  More fundamentally, it is clear to us that gambling and match-fixing scandals tend to tarnish the Leagues' reputations. Media reports to that effect abound. To take but one, after the Tim Donaghy NBA gambling and game-fixing scandal, commentators noted that "the integrity of the [NBA's] games just took a major hit." J.A. Adande, *Ref investigation only adds to bad perception of NBA*, ESPN.com, July 19, 2007, http://sports.espn.go.com/nba/columns/story?id=2943704. It is simply untenable to hold that the Leagues have not identified a trifle of reputational harm from an increase in even legal or licensed sports gambling.

that it is the State that is licensing the activity against the Leagues' wishes. But as then-Circuit Judge Scalia explained, an argument that the "public reaction [to] the alleged harm . . . is an irrational one . . . is irrelevant to the question of core, constitutional injury-in-fact, which requires no more than *de facto* causality." *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986).

We also find unpersuasive the contention that the increase in incentives to rig the outcome of the Leagues' games cannot give rise to standing because they depend on unknown actions of third parties. The Leagues do not seek to enjoin individuals from rigging games; they seek to enjoin New Jersey's law. That a third party's action may be necessary to complete the complained-of harm does not negate the existence of an injury in fact from the Sports Wagering Law or negate causation and redressability. "It is impossible to maintain . . . that there is no standing to sue

regarding action of a defendant which harms the plaintiff only

through the reaction of third persons. If that principle were

true, it is difficult to see how libel actions or suits for

inducing breach of contract could be brought in federal court.

. . ." *Id.* Thus, "the traceability requirement [may be] met

even where the conduct in question might not have been a

proximate cause of the harm." *Edmonson v. Lincoln Nat'l*

*Life Ins. Co.*, __ F.3d __, No. 12-1581, 2013 WL 4007553,

*7 (3d Cir. Aug. 7, 2013) (citing *The Pitt News*, 215 F.3d at

360-61).[3]

---

[3]    Appellants rely almost exclusively on *Simon v. East Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), for the proposition that the reputational injury at issue here is insufficient because it "result[s] 'from the independent action of some third party not before the court.'" N.J. Br. at 23 (quoting *Simon*, 426 U.S. at 41-42). This argument greatly overstates the effect of *Simon*. There, a group of indigent individuals brought suit against the IRS, asserting that the IRS's tax designation of certain hospitals harmed them by making it less likely that the hospitals would provide them free services. The Supreme Court concluded that the plaintiffs lacked standing because it was "purely speculative

Appellants also assert that granting summary judgment to the Leagues was improper because the effect of the studies and opinion polls was disputed by Appellants' own evidence. In particular, they point to evidence that (1) the Leagues have been economically prospering despite pervasive unregulated sports gambling and state-licensed sports gambling in Nevada; and (2) some individuals would have no interest in the Leagues' product unless they had a monetary interest in the outcome of games. But these arguments, which sound more like an appeal to commonsense with which, no doubt, many will agree as a policy matter, do not legally deprive the

whether the denials of services . . . fairly can be traced to [the IRS' actions] or instead result from decisions made by the hospitals without regard to the tax implications." *Simon*, 426 U.S. at 42-43. But here we are dealing with a law that licenses conduct that casinos could not otherwise undertake under the State's auspices, and thus the third party's actions are not truly independent of the State's conduct. *See Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941.

40

Leagues of standing and are insufficient to raise a genuine issue of material fact.

A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it. Our standing analysis is not an accounting exercise and it does not require a decision on the merits. *See, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) (noting that "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing"); *see also* 13A CHARLES A. WRIGHT & ARTHUR MILLER, FED. PRAC. & PROC. JURIS. 3d § 3531.4, 147 (3d ed. 2008). Nor must the Leagues construct counterfactuals analyzing whether they would have done better if PASPA had instituted a complete ban of state-licensed sports gambling or, conversely, worse if PASPA had not existed. And that fans may still buy tickets is not inconsistent with the notion that

41

the Leagues' esteem suffers in the eyes of fans, which requires the Leagues to take efforts to rehabilitate their image. That alone establishes injury in fact; that the Leagues may have been successful at rehabilitating their images does not deprive them of standing. *See, e.g.*, *Keene*, 481 U.S. at 475 ("[T]he need to take . . . affirmative steps to avoid the risk of harm to [one's] reputation constitutes a cognizable injury.").

As a last resort, Appellants question the Leagues' commitment to their own argument that state-licensed sports wagering harms them, noting that the Leagues hold events in jurisdictions, such as Canada and England, where gambling on sports is licensed, and that they promote and profit from products that are akin to gambling on sports, such as pay-to-play fantasy leagues. But standing is not defeated by a plaintiff's alleged unclean hands and does not require balancing the equities. That the Leagues may believe that holding events in Canada and England is not injurious to

42

them does not negate that harm may arise from an expansion of sports wagering to the entire country. The same can be said of the Leagues' promotion of fantasy sports, even if we accept that these activities are akin to head-to-head gambling.[4] And, as even Appellants recognize, it is not the Leagues' subjective beliefs that control. *See Lujan*, 504 U.S. at 564.

\* \* \*

That the Leagues have standing to enforce a prohibition on state-licensed gambling on their athletic contests seems to us a straightforward conclusion, particularly

---

[4] We note, however, the legal difference between paying fees to participate in fantasy leagues and single-game wagering as contemplated by the Sports Wagering Law. *See Humphrey v. Viacom, Inc.*, No. 06-2768 (DMC), 2007 WL 1797648, at \*9 (D.N.J. June 20, 2007) (holding that fantasy leagues that require an entry fee are not subject to anti-betting and wagering laws); *Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85, 86-87 (Nev. 1961) (holding that a "hole-in-one" contest that required an entry fee was a prize contest, not a wager).

43

given the proven stigmatizing effect of having sporting contests associated with gambling, a link that is confirmed by commonsense and Congress' own conclusions.[5]

## IV. <u>THE MERITS</u>

We turn now to the merits. The centerpiece of Appellants and amici's attack on PASPA is that it impermissibly commandeers the states. But at least one party raises the spectre that PASPA is also beyond Congress' authority under the Commerce Clause of the U.S. Constitution. We thus examine first whether Congress may even regulate the activities that PASPA governs. Only after concluding that Congress may do so can we consider

---

[5] We also note that, although the United States' intervention does not always give us jurisdiction, a court may treat intervention as a separate suit over which it has jurisdiction, if the intervenor has standing, particularly when the intervenor enters the proceedings at an early stage. *See, e.g.*, *Disability Advocates, Inc. v. New York Coal. For Assisted Living, Inc.*, 675 F.3d 149, 161 (2d Cir. 2012); *Fuller v. Volk*, 351 F.2d 323, 328 (3d Cir. 1965). Thus, the United States' intervention independently supports our jurisdiction.

whether, in exercising its affirmative powers, Congress

exceed a limitation imposed in the Constitution, such as by

the anti-commandeering and equal sovereignty principles.

*See, e.g.*, *Reno v. Condon*, 528 U.S. 141, 148-49 (2000)

(asking, first, whether a law was within Commerce Clause

powers and, second, whether the law violated the Tenth

Amendment).[6]

## A.     Whether PASPA is Within Congress' Commerce Clause Power

### 1.     Modern Commerce Clause Law

Among Congress' enumerated powers in Article I is

the ability to "regulate Commerce with foreign Nations, and

among the several States, and with the Indian Tribes."  U.S.

---

[6]     We review *de novo* a determination regarding PASPA's constitutionality, *Gov't of V.I. v. Steven*, 134 F.3d 526, 527 (3d Cir. 1998), and begin with the "time-honored presumption that [an act of Congress] is a constitutional exercise of legislative power."  *Reno*, 528 U.S. at 148 (internal quotation marks omitted) (quoting *Close v. Glenwood Cemetery*, 107 U.S. 446, 475 (1883)).

45

CONST., Art. I., § 8, cl. 3.  As is well-known, since *NLRB v. Jones & Laughlin Steel Corporation*, 301 U.S. 1 (1937), the Commerce Clause has been construed to give Congress "considerabl[e] . . . latitude in regulating conduct and transactions."  *United States v. Morrison*, 529 U.S. 598, 608 (2000).  For one, Congress may regulate an activity that "substantially affects interstate commerce" if it "arise[s] out of or [is] connected with a commercial transaction."  *United States v. Lopez*, 514 U.S. 549, 559 (1995).  By contrast, regulations of non-economic activity are disfavored.  *Id.* at 567 (striking down a law regulating possession of weapons near schools); *see also Morrison*, 529 U.S. at 613 (invalidating a law regulating gender-motivated violence).

    **2.**    **Gambling and the Leagues' Contests, Considered Separately or Together, Substantially Affect Interstate Commerce**

Guided by these principles, it is self-evident that the activity PASPA targets, state-licensed wagering on sports, may be regulated consistent with the Commerce Clause.

First, both wagering and national sports are economic activities. A wager is simply a contingent contract involving "two or more . . . parties, having mutual rights in respect to the money or other thing wagered." *Gibson*, 359 P.2d at 86; *see also* N.J. Stat. Ann. §§ 5:12-21 (defining gambling as engaging in a game "for money, property, checks, or any representative of value"). There can also be no doubt that the operations of the Leagues are economic activities, as they preside essentially over for-profit entertainment. *See, e.g.*, App. 1444 (NFL self-describing its "complex business model that includes a diverse range of revenue streams, which contribute . . . to company profitability").

Second, there can be no serious dispute that the professional and amateur sporting events at the heart of the

Leagues' operations "substantially affect" interstate commerce. The Leagues are associations comprised of thousands of clubs and members, [**App. 105**], which in turn govern the operations of thousands of sports teams organized across the United States, competing for fans and revenue across the country. "Thousands of Americans earn a . . . livelihood in professional sports. Tens of thousands of others participate in college sports." Senate Report at 3557. Indeed, some of the Leagues hold sporting events abroad, affecting commerce with Foreign Nations.

Third, it immediately follows that placing wagers on sporting events also substantially affects interstate commerce. As New Jersey indicates, Americans gamble up to $500 billion on sports each year. **[App. 330-31].** And whatever effects gambling on sports may have on the games themselves, those effects will plainly transcend state boundaries and affect a fundamentally national industry.

48

Accordingly, we have deferred to Congressional determinations that "gambling involves the use and has an effect upon interstate commerce." *United States v. Riehl*, 460 F.2d 454, 458 (3d Cir. 1972).

At bottom, it is clear that PASPA is aimed at an activity that is "quintessentially economic" and that has substantial effects on interstate commerce. *See Raich*, 545 U.S. at 19-20. Prohibiting the state licensing of this activity is thus a "rational . . . means of regulating commerce" in this area and within Congress' power under the Commerce Clause. *Id*. at 26.[7]

### 3. PASPA Does Not Unconstitutionally Regulate Purely Local Activities

---

[7] *But see Federal Baseball Club of Balt. v. Nat'l League of Prof'l Base Ball Clubs*, 259 U.S. 200, 208-09 (1922) (describing MLB's business as "giving exhibitions of base ball, which are purely state affairs," and concluding that baseball is not in interstate commerce for purposes of the Sherman Antitrust Act).

49

Appellants nevertheless assert that PASPA is unconstitutional because it "reaches unlimited betting activity . . . that cannot possibly affect interstate commerce . . . [such as] a casual bet on a Giants-Jets football game between family members." Br. of NJTHA at 34. Parsing words from the statute, they insist PASPA reaches these activities because it prohibits betting in "competitive games" involving "amateur or professional athletes." 28 U.S.C. § 3702. This argument is meritless.

For one, PASPA on its face does not reach the intrastate activities that Appellants contend it does. PASPA prohibits only gambling "schemes" and only those carried out "pursuant to law or compact." 28 U.S.C. § 3702. The activities described in Appellants' examples are nor carried out pursuant to state law, or pursuant to "a systemic plan; a connected or orderly arrangement . . . [or] [a]n artful plot or

50

plan." Black's Law Dictionary (9th Ed. 2009) (defining "scheme").

Moreover, even entertaining that PASPA somehow reaches these activities, Congressional action over them is permissible if Congress has a "rational basis" for concluding that the activity in the aggregate has a substantial effect on interstate commerce. *Raich*, 545 U.S. at 22. The rule of an unbroken line from *Wickard v. Filburn*, 317 U.S. 111 (1942), to *Raich*—respectively upholding limitations on growing wheat at home and personal marijuana consumption—is that when it comes to legislating economic activity, Congress can regulate "even activity that is purely intrastate in character . . . where the activity, combined with like conduct by other similarly situated, affects commerce among the States or with foreign nations." *Nat'l League of Cities v. Usery*, 426 U.S. 833, 840 (1976), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)

(alterations omitted). And there can be no doubt that Congress had a rational basis to conclude that the intrastate activities at issue substantially affect interstate commerce, given the reach of gambling, sports, and sports wagering into the far corners of the economies of the states, documented above.[8]

Appellants finally seek support in the Supreme Court's holding that the "individual mandate" of the Affordable Care

---

[8] Moreover, if PASPA reaching activities that are purely intrastate in nature were constitutionally problematic, we would construe its language as not reaching such acts. After all, "[t]he cardinal principle of statutory construction is to save and not to destroy . . . . [A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act." *Jones & Laughlin Steel*, 301 U.S. at 30. Appellants' reading of PASPA to reach casual bets between friends steamrolls that principle. At the very worst, we would leave for another day the question of whether PASPA may constitutionally be applied to such a local wager. Appellants today have not shown that "no set of circumstances exists under which the [challenged] Act would be valid." *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 623 (3d Cir. 2013) (alteration in original).

Act is beyond Congress' power under the Commerce Clause. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012). But the problem in *Sebelius* was that the *method* chosen to regulate (forcing into economic activity individuals previously not in the market for health insurance) was beyond Congress' power. Here, the method of regulation, banning an activity altogether (in this case the expansion of State-sponsored sports betting), is neither novel nor problematic. *See, e.g.*, *Raich*, 545 U.S. at 27.

**B.     Whether PASPA Impermissibly Commandeers the States**

Having concluded that Congress may regulate sports wagering consistent with the Commerce Clause, we turn to PASPA's operation in the case before us.

As noted, PASPA makes it "unlawful for a governmental entity to . . . authorize by law or compact" gambling on sports. 28 U.S.C. § 3702. This is classic

53

preemption language that operates, via the Constitution's Supremacy Clause, *see* U.S. CONST., art. VI, cl. 2, to invalidate state laws that are contrary to the federal statute. *See, e.g.*, *Am. Trucking Ass'ns v. City of Los Angeles*, 133 S. Ct. 2096, 2100-01, 2102 (2013) (explaining that the provision of the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") that states a "'State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property' . . . preempts State laws related to a price, route, or service of any motor carrier with respect to the transportation of property" (quoting 49 U.S.C. § 14501(c)(1)). The Sports Wagering Law is precisely what PASPA says the states may not do—a purported authorization by law of sports wagering. It is therefore invalidated by PASPA.[9]

---

[9]     This straightforward operation of the Supremacy Clause, which operates on states laws that are foreclosed by a

Appellants do not contest any of the foregoing, but argue instead that PASPA's operation over the Sports Wagering Law violates the "anti-commandeering" principle, which bars Congress from conscripting the states into doing the work of federal officials. The import of this argument, then, is that impermissible anti-commandeering may occur even when all a federal law does is supersede state law via the Supremacy Clause. But the Supreme Court's anti-commandeering jurisprudence has never entertained this position, let alone accepted it.

### 1. The Anti-Commandeering Principle

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). And it is well-known that all powers not

stand-alone federal provision, is not to be confused with *field preemption* of sports wagering, a topic we discuss at part IV.B.2.d below.

55

explicitly conferred to the federal government are reserved to the states, a maxim reflected in the text of the Tenth Amendment.  U.S. CONST., amdt. X; *see also United States v. Darby*, 312 U.S. 100, 123-24 (1941) (describing this as a "truism" embodied by the Tenth Amendment).

Among the important corollaries that flow from the foregoing is that any law that "commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program" is beyond the inherent limitations on federal power within our dual system. *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 283, 288 (1981).  Stated differently, Congress "lacks the power directly to compel the States to require or prohibit" acts which Congress itself may require or prohibit.  *New York v. United States*, 505 U.S. 144, 166, 180 (1992).  The Supreme Court has struck down laws based on these

principles on only two occasions, both distinguishable from PASPA.

**(a)     Permissible regulation in a pre-emptible field:** *Hodel* **and** *FERC*

The first modern, relevant incarnation of the anti-commandeering principle appeared in *Hodel v. Virginia Surface Mining & Reclamation Ass'n*.  The law at issue there imposed federal standards for coal mining on certain surfaces and required any state that wished to "assume permanent regulatory authority over . . . surface coal mining operations" to "submit a proposed permanent program" to the Federal Government, which, among other things, required the "state legislature [to] enact[] laws implementing the environmental protection standards established by the [a]ct." *Hodel*, 452 U.S. at 271.  If a particular state did *not* wish to implement the federal standards, the federal government would step in to do so.  *Id*. at 272.  The Supreme Court upheld the provisions,

noting that they neither compelled the states to adopt the federal standards, nor required them "to expend any state funds," nor coerced them into "participat[ing] in the federal regulatory program in any manner whatsoever." *Id.* at 288. The Court further concluded that Congress could have chosen to completely preempt the field by simply assuming oversight of the regulations itself. *Id.* It thus held that the Tenth Amendment posed no obstacle to a system by which Congress "chose to allow the States a regulatory role." *Id.* at 290. As the Court later characterized *Hodel*, the scheme there did not violate the anti-commandeering principle because it "merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field." *Printz v. United States*, 521 U.S. 898, 926 (1997).

The next year, in *F.E.R.C. v. Mississippi*, the Court upheld a provision *requiring* state utility regulatory

commissions to "consider" whether to enact certain standards for energy efficiency but leaving to the states the ultimate choice of whether to adopt those standards or not. 456 U.S. 742, 746, 769-70 (1982). The Court upheld the law despite its outright commandeering of the state resources needed to consider and study the federal standards, because the law did not definitely require the enactment or implementation of federal standards. *Id.* at 764. The Court, noting that Congress had simply regulated where it could have "preempt[ed] the States entirely" but instead chose to leave some room for the states to maneuver, saw the case as "only one step beyond *Hodel*." *Id.*

**(b)** **Permissible Prohibitions on State Action: *Baker* and *Reno***

In a different pair of anti-commandeering cases, the Court upheld affirmative prohibitions on state action that effectively invalidated contrary state laws and even required

59

the states to enact new measures.  First, in *South Carolina v. Baker*, the Supreme Court upheld the validity of laws that "directly regulated the States by prohibiting outright the issuance of bearer bonds."  485 U.S. 505, 511 (1988).  These rules, which also applied to private debt issuers, required the states to "amend a substantial number of statutes in order to [comply]." *Id.* at 514.  The Court concluded this result did not run afoul the Tenth Amendment because it did not "seek to control or influence the manner in which States regulate private parties" but was simply "an inevitable consequence of regulating a state activity," *id*.  In subsequent cases, the Court explained that the regulation in *Baker* was permissible because it simply "subjected a State to the same legislation applicable to private parties." *New York*, 505 U.S. at 160.

Then, in *Reno v. Condon*, the Court unanimously rejected an anti-commandeering challenge to a law prohibiting states from disseminating personal information

obtained by state departments of motor vehicles. South Carolina complained that the act required its employees to learn its provisions and expend resources to comply and, indeed, the federal law effectively blocked the operation of state laws governing the disclosure of that information. 528 U.S. at 150. The Court agreed "that the [act] will require time and effort on the part of state employees" but otherwise rejected the anti-commandeering challenge because, like the law in *Baker*, the law "d[id] not require the States in their sovereign capacity to regulate their own citizens[,] . . . d[id] not require the [State] Legislature[s] to enact any laws or regulations, and it d[id] not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Id.* at 151. Moreover, the law did not "seek to control[] or influence the manner in which States regulate private parties." *Id.* (citing *Baker*, 485 U.S. at 514-15).

### (c) Impermissible Anti-Commandeering: *New York* and *Printz*

In contrast to the foregoing, the Court has twice struck down portions of a federal law on anti-commandeering grounds. The first was in *New York v. United States*, which dealt with a law meant to regulate and encourage the orderly disposal of low-level radioactive waste by the states. 505 U.S. at 149-54. The "most severe" aspect of the complex system of measures established by the law, referred to as the "take-title" provision, provided that if a particular state had not been able to arrange for the disposal of the radioactive waste by a specified date, then that state would have to take title to the waste at the request of the waste's generator. *Id.* at 153-54 (citing 42 U.S.C. § 2021e(d)(2)(C)). The Court, based on the notion that "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal

regulatory program,'" *id.* at 161 (quoting *Hodel*, 452 U.S. at 288) (alterations omitted), struck down the take-title provision because it did just that: compel the states to either enact a regulatory program, or expend resources in taking title to the waste. *Id.* at 176. The Court noted that Congress may enact measures to encourage the states to act and may "hav[e] state law pre-empted by federal regulation" but concluded that the take-title provision "crossed the line distinguishing encouragement from coercion." *Id.* at 167, 175. The Court also emphasized that the anti-commandeering principle was designed, in part, to stop Congress from blurring the line of accountability between federal and state officials and from skirting responsibility for its choices by foisting them on the states. *Id.* at 168.

The Court then applied these principles, in *Printz*, to invalidate the provisions of the Brady Act that required local authorities of certain states to run background checks on

persons seeking to purchase guns. The Court held that Congress "may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program." 521 U.S. at 935. The Court was also troubled that these provisions required states to "absorb the financial burden of implementing a federal regulatory program" and "tak[e] the blame for its . . . defects." *Id.* at 930.

To date, the schemes at issue in *New York* and *Printz* remain the only two that the Supreme Court has struck down under the anti-commandeering doctrine. Our Court has not yet had occasion to consider an anti-commandeering challenge.[10]

---

[10] Three other cases complete the constellation of the Supreme Court's modern anti-commandeering jurisprudence but deal with the applicability of federal labor laws to certain State employees. *See Nat'l League of Cities*, 426 U.S. at 883; *Garcia*, 469 U.S. at 528; *Gregory*, 501 U.S. at 452. These cases are of marginal relevance, so we do not elaborate on

## 2. Whether PASPA Violates the Anti-Commandeering Principle

### (a) Anti-Commandeering and the Supremacy Clause

Appellants' arguments that PASPA violates anti-commandeering principles run into an immediate problem: not a single case that we have reviewed involved a federal law that, like PASPA, simply operated to invalidate contrary state laws. It has thus never been the case that applying the Supremacy Clause to invalidate a state law contrary to federal proscriptions is tantamount to direct regulation over the states, to an invasion of their sovereignty, or to commandeering. Most of the foregoing cases involved Congress attempting to directly impose a federal scheme on state officials. If anything, the federal laws in *Reno* and

them at length. *See also Markell*, 579 F.3d at 303 (rejecting an argument that PASPA violates the sovereignty principles set forth in *Gregory*).

*Baker* had the effect of invalidating certain contrary state laws by prohibiting state action, and both survived.  Indeed, the Justices in both *New York* and *Printz* disclaimed any notion that the anti-commandeering principle somehow suspends the operation of the Supremacy Clause on otherwise valid laws. For example, in *Printz* the Court explained that our Constitutional structure requires "*all* state officials . . . to enact, enforce, and interpret state law in such a fashion as not to obstruct the operation of federal law, and the attendant reality [is] that all state actions constituting such obstruction, even legislative Acts, are *ipso facto* invalid."  521 U.S. at 913; *see also New York*, 505 U.S. at 162 (noting that the Commerce Clause permits Congress to "hav[e] state law pre-empted by federal [law]").

In light of the fact that the Supremacy Clause is the Constitution's answer to the problem that had made life difficult under the Articles of Confederation—the lack of a

mechanism to enforce uniform national policies—accepting Appellants' position that a state's sovereignty is violated when it is precluded from following a policy different than that set forth by federal law (as New Jersey seeks to do with its Sports Wagering Law), would be revolutionary. *See* The Federalist No. 44, at 323 (James Madison) (B. Fletcher ed. 1996) (explaining that without the Supremacy Clause "all the authorities contained in the proposed Constitution . . . would have been annulled, and the new Congress would have been reduced to the same impotent condition with [the Articles of Confederation]").

And it is not hard to see why invalidating contrary state law does not implicate a state's sovereignty or otherwise commandeer the states. When Congress passes a law that operates via the Supremacy Clause to invalidate contrary state laws, it is not telling the states what to do, it is barring them from doing something they want to do. Anti-commandeering

challenges to statutes worded like PASPA have thus consistently failed. *See, e.g.*, *Kelley v. United States*, 69 F.3d 1503, 1510 (10th Cir. 1995) (upholding constitutionality of intrastate motor carrier statute, noting that it preempted state law and in doing so did not "compel[] the states to voluntarily act by enacting or administering a federal regulatory program"); *California Dump Truck Owners Ass'n v. Davis*, 172 F. Supp. 2d 1298, 1304 (E.D. Cal. 2001) (upholding constitutionality of FAAAA provision against an anti-commandeering challenge, noting that, unlike the laws in *New York* and *Printz*, the FAAAA provision, insofar as it merely preempts state law, "tell[s] states *what not to do*").[11]

---

[11] As the Leagues note, numerous federal laws are framed to prohibit States from enacting or enforcing laws contrary to federal standards, and these regulations all enjoy different preemptive qualities. *See, e.g.*, *Farina v. Nokia*, 625 F.3d 97, 130 (3d Cir. 2010) (noting that statute which provides that "no State . . . shall have any authority to regulate the entry of or the rates charged by any commercial mobile service" is an express preemption provision);

To be sure, the Supremacy Clause elevates only laws that are otherwise within Congress' power to enact. *See, e.g.*, *New York*, 504 U.S. at 166 (noting that Congress may not, consistent with the Commerce Clause, "regulate state governments' regulation of interstate commerce"). But we have held that Congress may prohibit state-licensed gambling consistent with the Commerce Clause. The argument that PASPA is beyond Congress' authority thus hinges on the notion that the invalidation of a state law pursuant to the Commerce Clause has the same "commandeering" effect as the federal laws struck down in *New York* and *Printz*. We turn now to this contention.

---

*MacDonald v. Monsanto*, 27 F.3d 1021, 1024 (5th Cir. 1994) (noting that law stating that a "State shall not impose or continue in effect any requirement for labeling or packing" pesticides is a preemption provision). The operation of these and other provisions is called into question by Appellants' view that the everyday operation of the Supremacy Clause raises anti-commandeering concerns.

### (b) PASPA is Unlike the Laws Struck Down in *New York* and *Printz*

Appellants' efforts to analogize PASPA to the provisions struck down in *New York* and *Printz* are unavailing. Unlike the problematic "take title" provision and the background check requirements, PASPA does not *require* or coerce the states to lift a finger—they are not required to pass laws, to take title to anything, to conduct background checks, to expend any funds, or to in any way enforce federal law. They are not even required, like the states were in *F.E.R.C.*, to expend resources considering federal regulatory regimes, let alone to adopt them. Simply put, we discern in PASPA no "directives requiring the States to address particular problems" and no "command[s] to the States' officers . . . to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935.

As the District Court correctly reasoned, the fact that PASPA sets forth a prohibition, while the *New York*/*Printz* regulations required affirmative action(s) on the part of the states, is of significance. Again, it is hard to see how Congress can "commandeer" a state, or how it can be found to regulate how a state regulates, if it does not require it to do anything at all. The distinction is palpable from the Supreme Court's anti-commandeering cases themselves. State laws requiring affirmative acts may or may not be constitutional, *compare F.E.R.C.*, 456 U.S. at 761-63 (upholding statute because requirement that states expend resources considering federal standards was not commandeering) *with Printz*, 521 U.S. at 904-05 (finding requirement that states perform background checks unconstitutional). On the other hand, statutes prohibiting the states from taking certain actions have never been struck down even if they require the expenditure of some time and effort or the modification or invalidation of

71

contrary state laws, *see Baker*, 485 U.S. at 515; *Reno*, 528 U.S. at 150. As the District Court carefully demonstrated, in all its anti-commandeering cases, the Supreme Court has been concerned with conscripting the states into affirmative action. *See NCAA II*, 2013 WL 772679, at *17.[12]

Recognizing the importance of the affirmative/negative command distinction, Appellants assert that PASPA does impose an affirmative requirement that the states act, by prohibiting them from repealing anti-sports

---

[12] The circuits that have considered anti-commandeering challenges, although addressing laws that are fundamentally different from PASPA, have similarly found this distinction significant. *See, e.g.*, *Connecticut v. Physicians Health Servs. of Conn.*, 287 F.3d 110, 122 (2d Cir. 2002) (holding that a provision "limit[ing] states' power to sue as *parens patriae . . . does not commandeer any branch of state government because it imposes no affirmative duty of any kind on them*"); *Fraternal Order of Police v. United States*, 173 F.3d 898, 906 (D.C. Cir. 1999) (rejecting a commandeering challenge to a statute that did "not force state officials to do anything affirmative to implement" the statutory provision).

wagering provisions.[13]  We agree with Appellants that the affirmative act requirement, if not properly applied, may permit Congress to "accomplish exactly what the commandeering doctrine prohibits" by stopping the states from "repealing an existing law." *Conant v. Walters*, 309 F.3d 629, 646 (9th Cir. 2002) (Kozinski, J., concurring).  But we do not read PASPA to prohibit New Jersey from repealing its ban on sports wagering.

---

[13]  Appellants also rely on *Coyle v. Smith*, where the Supreme Court struck down a law requiring Oklahoma to not change the location of its capital within seven years of its admission into the Union, 221 U.S. 559, 567 (1911), to lessen the significance of the "affirmative act" requirement we distill from the anti-commandeering cases.  N.J. Br. 42, 44.  But, despite the Supreme Court's citation to *Coyle* in *New York*, *see* 505 U.S. at 162, *Coyle* did not turn on impermissible commandeering.  Instead, the Court struck down the statute as being traceable to no power granted by Congress in the Constitution, pertaining "purely to the internal polic[ies] of the state," and in violation of the principle that all states are admitted on equal footing into the Union.  *Coyle*, 221 U.S. at 565, 579.  PASPA does not raise any of these concerns, and neither do the modern anti-commandeering cases.

Under PASPA, "[i]t shall be unlawful for . . . a governmental entity to sponsor, operate, advertise, promote, *license, or authorize by law or compact*" a sports wagering scheme. 28 U.S.C. § 3702(1) (emphasis added). Nothing in these words *requires* that the states keep any law in place. All that is prohibited is the issuance of gambling "license[s]" or the affirmative "authoriz[ation] *by law*" of gambling schemes. Appellants contend that to the extent a state may choose to repeal an affirmative prohibition of sports gambling, that is the same as "authorizing" that activity, and therefore PASPA precludes repealing prohibitions on gambling just as it bars affirmatively licensing it. This argument is problematic in numerous respects. Most basically, it ignores that PASPA speaks only of "authorizing *by law*" a sports gambling scheme. We do not see how having *no law* in place governing sports wagering is the same as authorizing it by law. Second, the argument ignores that,

74

in reality, the lack of an affirmative prohibition of an activity does not mean it is *affirmatively* authorized by law. The right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people. Indeed, that the Legislature needed to enact the Sports Wagering Law itself belies any contention that the mere repeal of New Jersey's ban on sports gambling was sufficient to "authorize [it] by law." The amendment to New Jersey's Constitution itself did not purport to affirmatively authorize sports wagering but indeed only gave the Legislature the power to "authorize by law" such activities. N.J. Const. Art. IV, § VII, ¶ 2 (D), (F). Thus, the New Jersey Legislature itself saw a meaningful distinction between repealing the ban on sports wagering and authorizing it by law, undermining any contention that the amendment alone was sufficient to affirmatively authorize sports wagering—the Sports Wagering Law was required. *Cf. Hernandez v. Robles*,

75

855 N.E.2d 1, 5-6 (N.Y. 2006) (rejecting as "untenable" a construction of a domestic relation law, silent on the matter of the legality of same-sex marriages, as permitting such unions). Congress in PASPA itself saw a difference between general sports gambling activity and that which occurs under the auspices of state approval and authorization, and chose to reach private activity only to the extent that it is conducted "pursuant to State law."

In short, Appellants' attempt to read into PASPA a requirement that the states must affirmatively keep a ban on sports gambling in their books rests on a false equivalence between repeal and authorization and reads the term "by law" out of the statute, ignoring the fundamental canon that, as between two plausible statutory constructions, we ought to prefer the one that does not raise a series of constitutional problems. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).

To be sure, we take seriously the argument that many affirmative commands can be easily recast as prohibitions. For example, the background check rule of *Printz* could be recast as a requirement that the states *refrain* from issuing handgun permits *unless* background checks are conducted by their officials. The anti-commandeering principle may not be circumvented so easily. But the distinction between PASPA's blanket ban and *Printz*'s command, even if the latter is recast as a prohibition, remains. PASPA does not say to states "you may only license sports gambling if you conscript your officials into policing federal regulations" or otherwise impose any condition that the states carry out an affirmative act or implement a federal scheme before they may regulate or issue a license. It simply bars certain acts under any and all circumstances. And if affirmative commands may always be recast as prohibitions, then the prohibitions in myriads of routine federal laws may always be

rephrased as affirmative commands.  This shows that Appellants' argument proves too much—the anti-commandeering cases, under that view, imperil a plethora of acts currently termed as prohibitions on the states.

And, to the extent we entertain the notion that PASPA's straightforward *prohibition* on action may be recast as presenting two *options*, these options are also quite unlike the two coercive choices available in *New York*—pass a law to deal with radioactive waste or expend resources in taking title to it.  Neither of PASPA's two "choices" affirmatively requires the states to enact a law, and both choices leave much room for the states to make their own policy.  Thus, under PASPA, on the one hand, a state may repeal its sports wagering ban, a move that will result in the expenditure of no resources or effort by any official.  On the other hand, a state may choose to keep a complete ban on sports gambling, but it is left up to each state to decide how much of a law

78

enforcement priority it wants to make of sports gambling, or what the exact contours of the prohibition will be.

We agree that these are not easy choices. And it is perhaps true (although there is no textual or other support for the idea) that Congress may have suspected that most states would choose to keep an actual prohibition on sports gambling on the books, rather than permit that activity to go on unregulated. But the fact that Congress gave the states a hard or tempting choice does not mean that they were given no choice at all, or that the choices are otherwise unconstitutional. *See United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000) ("A hard choice is not the same as no choice."); *see also F.E.R.C.*, 456 U.S. at 766 (upholding a choice between expending state resources to consider federal standards or abandoning field to federal regulation). And however hard the choice is in PASPA, it is nowhere near as coercive as the provisions in *New York* that punished states

unwilling to enact a regulatory scheme and that did pass muster. *See New York*, 505 U.S. at 172, 173-74 (upholding a provision permitting states with waste disposal sites to charge more to non-compliant states and a statute taxing such states to the benefit of compliant states); *see also City of Abilene v. EPA*, 325 F.3d 657, 662 (5th Cir. 2003) (explaining that as long as "the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation"). PASPA imposes no punishment or punitive tax. We also disagree with the suggestion that the choices states face under PASPA are as coercive as the Medicaid expansion provision struck down in *Sebelius*, which threatened states unwilling to participate in a complex and extensive federal regulatory program with the loss of funding

80

amounting to over ten percent of their overall budget.

*Sebelius*, 132 S. Ct. at 2581.

Finally, we note that the attempt to equate a ban on state-sanctioned sports gambling to a plan by Congress to force the states into banning the activity altogether gives far too much credit to Congress' strong-arming powers. The attendant reality is that in the field of regulating certain activities, such as gambling, prostitution, and drug use, states have always gravitated towards prohibitions, regardless of Congress' efforts. Indeed, as noted, *all but one* state prohibited broad state-sponsored gambling at the time PASPA was enacted. Congress, by prohibiting state-licensing schemes, may indeed have made it harder for states to turn their backs on the choices they previously made (although in PASPA it made it less hard for New Jersey), but that choice was already very hard, and very unlikely to be made to begin

with (as New Jersey's history with the regulation of sports gambling also illustrates).

(c)     **PASPA as Regulating State Conduct—** *Baker* **and** *Reno*

Additionally, PASPA is remarkably similar to the prohibitions on state action upheld in *Baker* and *Reno*. *Baker*'s regulations prohibited the states from issuing bearer bonds, which in turn required states to issue new regulations and invalidated old ones; *Reno*'s anti-disclosure provisions prohibited the states from disseminating certain information, necessitating the expenditure of resources to comply with the federally imposed prohibitions.  To the extent PASPA makes it unattractive for states to repeal their anti-sports wagering laws, which in turn requires enforcement by states, the effort PASPA requires is simply that the states enforce the laws they choose to maintain, and is therefore plainly less intrusive than the laws in *Baker* and *Reno*.  PASPA also has the effect,

like the laws in those two cases, of rendering inoperative any contrary state laws.

We are not persuaded by Appellants' arguments that *Baker* and *Reno* are inapposite. They contend, first, that *Reno* is different because it involved regulation of the states in the same way as private parties. But that overstates the regulations at issue in *Reno*, which were directed at state DMVs and only incidentally prohibited private persons from further disseminating data they may obtain from the DMVs. *See* 528 U.S. at 144. Indeed, the *Reno* Court did "not address the question whether general applicability is a constitutional requirement for federal regulation of the States." *Id.* at 151. And, as mentioned, PASPA *does* operate on private individuals insofar as it prohibits them from engaging in state-sponsored gambling. But private individuals cannot be prohibited from issuing gambling licenses, because they have never been able to do so. Second, we find no basis to

distinguish PASPA from the laws in *Reno* and *Baker* on the ground that the latter regulate the states solely as participants in the market. DMVs are uniquely state institutions; states thus obtain information through the DMVs not as participants in the market, but in their unique role as authorizers of commercial activity. PASPA is no different: it regulates the states' permit-issuing activities by prohibiting the issuance of the license altogether, as in *Baker*, where the state was essentially prohibited from issuing the bearer bond. Third, we decline to draw a distinction between PASPA and the laws at issue in *Reno* and *Baker* on the ground that PASPA involves a regulation of the states as states. The Supreme Court's anti-commandeering cases do not contemplate such distinction.[14]

---

[14] And, arguably, the Supreme Court's Tenth Amendment jurisprudence cautions against drawing lines between activities that are "traditional" to state government

Despite the fact that PASPA is very similar to the prohibition on state activity upheld unanimously in *Reno*, Appellants insist that certain statements in that opinion support its view that PASPA is unconstitutional.  Appellants insist that under *Reno* a law is unconstitutional if it requires the states to govern according to Congress' instructions or if it "influences" the ways in which the states regulate their own citizens.  *See* N.J. Br. at 3, 18, 40, 42, 43, 45-46, 52.  But no one contends that PASPA requires the states to enact any laws, and we have held that it also does not require states to maintain existing laws.  And one line from *Reno*, that the law upheld there did not "control or influence the manner in which States regulated private parties," 528 U.S. at 142, cannot possibly bear the great weight that Appellants would hoist upon it.  Most federal regulation inevitably influences

---

and those that are not.  *See Garcia*, 469 U.S. at 546 (calling such distinctions "unworkable").

the manner in which states regulate private parties. If that were enough to violate the anti-commandeering principle, then *Hodel* and *F.E.R.C.* were wrongly decided. Indeed, nowhere in *Reno* (or *Baker*, from where that line was quoted, *see id.* (quoting *Baker*, 485 U.S. at 514)), did the Court suggest that the absence of an attempt to influence how states regulate private parties was *required* to avoid violating the anti-commandeering principle.[15]

      **(d)    The Sports Wagering Law Conflicts With Federal Policy With Respect to Sports Gambling and is Therefore Preempted**

---

[15] The parties spar over how the accountability concerns of anti-commandeering cases weigh here. But *New York* and *Printz* make clear that they are not implicated when Congress does not enlist the States in the implementation of a federal regulatory program. To strike down any law that may cause confusion as to whether a prohibition comes from the federal government or from a State's choice, before considering whether that law actually commandeers the States, is to put the cart before the horse. Indeed, the Supreme Court in *Reno* rejected the notion that simply raising the specter of accountability problems is enough to find an anti-commandeering violation. *See* 528 U.S. at 150-51.

Alternatively, to the extent PASPA coerces the states into keeping in place their sports-wagering bans, that coercion may be upheld as fitting into the exception drawn in anti-commandeering cases for laws that impose federal standards over conflicting state rules, in areas where Congress may otherwise preempt the field.  Under this view, PASPA gives states the choice of either implementing a ban on sports gambling or of accepting complete deregulation of that field as per the federal standard.  In *Hodel*, for example, the choice was implementing certain minimum-safety regulations or living in a world where the federal government enforced them.

PASPA makes clear that the federal policy with respect to sports gambling is that such activity should not occur under the auspices of a state license.  As noted, PASPA prohibits individuals from engaging in a sports gambling scheme "pursuant to" state law.  28 U.S.C. § 3702(2).  In

other words, even if the provision that offends New Jersey, § 3702(1), were excised from PASPA, § 3702(2) would still plainly render the Sports Wagering Law inoperative by prohibiting private parties from engaging in gambling schemes pursuant to that authority. Thus, the federal policy with respect to sports wagering that § 3702(2) evinces is clear: to stop private parties from resorting to state law as a cover for gambling on sports. The Sports Wagering Law, in purporting to permit individuals to skirt § 3702(2), "authorizes [private parties] to engage in conduct that the federal [Act] forbids, [and therefore] it 'stands as an obstacle to the[] accomplishment and execution of the full purposes and objectives of Congress,'" and accordingly conflicts with PASPA and is preempted. *See Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 469 (1984).[16]

---

[16] New Jersey asks that we ignore this argument because

88

And there are other provisions in federal law, outside of PASPA, aimed at protecting the integrity of sports from the pall of wagering and that further demonstrate the federal policy of disfavoring sports-gambling. Indeed, in enacting PASPA, Congress explicitly noted that the law was "complementary to and consistent with [then] current Federal law" with respect to sports wagering. Senate Report at 3557. Congress has, for example, criminalized attempts to fix the outcome of a sporting event, 18 U.S.C. § 224, barred the placement of a sports gambling bet through wire

it was not raised by the United States below. But it is axiomatic that we may affirm on any ground apparent on the record, particularly when considering *de novo* the constitutionally of a Congressional enactment. The United States may decide not to advance particular arguments, but we may not, consistent with our duty to "save and not to destroy," *Jones & Laughlin Steel*, 301 U.S. at 30, use that choice to declare unconstitutional an act of Congress. The same may be said of arguments that the United States and the Leagues' reading of PASPA has changed throughout the litigation and should therefore be discounted, *see, e.g.*, Oral Arg. Tr. 71:14-19 (June 26, 2013).

communications to or from a place where such bets are illegal, 18 U.S.C. § 1084, and proscribed interstate transportation of means for carrying out sports lotteries, 18 U.S.C. §§ 1301, 1307(d).[17]

Appellants contend that Congress has not preempted state law but instead incorporated it to the extent certain prohibitions are tied to whatever is legal under state law. But PASPA itself is not tied to state law. Rather, PASPA

---

[17] Appellants point to a statement in the Senate Report wherein the Committee notes that, according to the Congressional Budget Office, there would be "no cost to the federal government . . . from enactment of this bill," Senate Report at 3561, as proof that PASPA seeks to foist upon the states the responsibility for banning sports wagering. But this statement is taken out of context. The import of it was that PASPA would require no "direct spending or receipts" of funds, *id.*, but the Senate Report itself makes clear that the Justice Department would use already-earmarked funds to permit it to "enforce the law without utilizing criminal prosecutions of State officials," *id.* at 3557. For a report issued well before the opinions in *New York* and *Printz* delineated the contours of modern anti-commandeering jurisprudence, the Senate Report is remarkably clear in that it seeks to increase the federal government's role in policing sports wagering, not pass that obligation along to the states.

prohibits engaging in schemes *pursuant to* state law.  28

U.S.C. § 3702(2).  To be sure, some of the other cited

provisions tie themselves to state law—but the Tenth

Amendment does not require that Congress leave *less* room

for the states to govern.  *Cf. F.E.R.C.*, 456 U.S. at 764 (noting

that there is no Tenth Amendment problem if Congress

"allow[s] the States to enter the field if they promulgate[]

regulations consistent with federal standards").

Appellants also attempt to distinguish PASPA from

other preemptive schemes.  They note that preemptive

schemes normally either impose an affirmative federal

standard or a rule of non-regulation, and that PASPA does not

impose an affirmative federal standard and cannot possibly be

construed as a law aimed at permitting unregulated sports

gambling because its aim was to stop the spread of sports

gambling.  But, PASPA's text and legislative history reflect

that its goal is more modest—to ban gambling pursuant to a

state scheme—because Congress was concerned that state-sponsored gambling carried with it a label of legitimacy that would make the activity appealing. Whatever else we may think were Congress' secret intentions in enacting PASPA, nothing we know of speaks to a desire to ban all sports wagering. Moreover, the argument once again ignores that PASPA does impose a federal standard directly on private individuals, telling them, essentially, thou shall not engage in sports wagering under the auspices of a state-issued license. *See* 28 U.S.C. § 3702(2).

\* \* \*

We hold that PASPA does not violate the anti-commandeering doctrine. Although many of the principles set forth in anti-commandeering cases may abstractly be used to support Appellants' position, doing so would result in an undue expansion of the anti-commandeering doctrine. If attempting to influence the way states govern private parties,

or requiring the expenditure of resources, or giving the states hard choices, were enough to violate anti-commandeering principles, then what of *Hodel, F.E.R.C.*, *Baker*, and *Reno*? The overriding of contrary state law via the Supremacy Clause may result in influencing or changing state policies, but there is nothing in the anti-commandeering cases to suggest that the principle is meant to apply when a law merely operates via the Supremacy Clause to invalidate contrary state action. Missing here is an affirmative command that the states enact or carry out a federal scheme and PASPA is simply nothing like the only two laws struck down under the anti-commandeering principle. Several important points buttress our conclusion: first, PASPA operates simply as a law of pre-emption, via the Supremacy Clause; second, PASPA thus only *stops* the states from doing something; and, finally, PASPA's policy of stopping state-sanctioned sports gambling is confirmed by the independent

prohibition on private activity pursuant to any such law. When so understood, it is clear that PASPA does not commandeer the states.

## C. Whether PASPA Violates the Equal Sovereignty of the States

Finally, we address Appellants' contention that PASPA violates the equal sovereignty of the states by singling out Nevada for preferential treatment and allowing only that State to maintain broad state-sponsored sports gambling.

### 1. Equal Sovereignty Cases—*Northwest Austin* and *Shelby County*

The centerpiece of Appellants' equal sovereignty argument is the Supreme Court's analysis of the Voting Rights Act of 1965 ("VRA") in *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009), and *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612

(2013). In *Northwest Austin*, the Supreme Court was asked by a small utility district to rule on the constitutionality of § 5 of the VRA, which required the district to obtain preclearance from federal authorities before it could make changes to the manner in which its board was elected. The district had sought an exemption from the preclearance requirement, but the district court held that only states are eligible for such "bailouts" under the Act. *Nw. Austin*, 557 U.S. at 196-97. On direct appeal, the Supreme Court stated that § 5 raises "federalism concerns" because it "differentiates between the States." *Id.* at 203. The Court also explained that "[d]istinctions [between the states] can be justified in some cases" such as when Congress enacts "remedies for *local evils which have subsequently appeared.*" *Id.* (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 328-29 (1966)). However, the Court did not ultimately decide whether § 5 violated the equal sovereignty principle, invoking instead the

canon of constitutional avoidance to construe the VRA's

bailout provision to permit the district to obtain an exemption.

*Id.* at 205.

In *Shelby County*, when asked to revisit the

constitutionality of § 5, the Court reiterated the "basic

principles" of equal sovereignty set forth in *Northwest Austin*

and invalidated § 4(b) of the VRA, which set forth a formula

used to determine what jurisdictions are covered by § 5

preclearance. 133 S. Ct. at 2622, 2630-31. Nevertheless, § 5

once more survived despite the expressed equal sovereignty

concerns. *Id.* at 2631.

Appellants ask that we leverage these statements to

strike down all of PASPA because it permits Nevada to

license sports gambling. We decline to do so. First, the VRA

is fundamentally different from PASPA. It represents, as the

Supreme Court explained, "an uncommon exercise of

congressional power" in an area "the Framers of the

Constitution intended the States to keep for themselves . . .

the power to regulate elections." *Shelby County*, 133 S. Ct. at

2623, 2624. The regulation of gambling via the Commerce

Clause is thus not of the same nature as the regulation of

elections pursuant to the Reconstruction Amendments.

Indeed, while the guarantee of uniformity in treatment

amongst the states cabins some of Congress' powers, *see,*

*e.g.*, U.S. CONST., art. I., § 8, cl. 1 (requiring uniformity in

duties and imposts); *id.* § 9, cl. 6 (requiring uniformity in

regulation of state ports), no such guarantee limits the

Commerce Clause. This only makes sense: Congress'

exercises of Commerce Clause authority are aimed at matters

of national concern and finding national solutions will

necessarily affect states differently; accordingly, the

Commerce Clause, "[u]nlike other powers of [C]ongress[,] . .

. does not require geographic uniformity." *Morgan v.*

97

*Virginia*, 328 U.S. 373, 388 (1946) (Frankfurter, J., concurring).

Second, New Jersey would have us hold that laws treating states differently can "only" survive if they are meant to "remedy local evils" in a manner that is "sufficiently related to the problem that it targets."  N.J. Br. at 55.  This position is overly broad in that it requires the existence of a one-size-fits-all test for equal sovereignty analysis, which, as the foregoing shows, is a perilous proposition in the context of the Commerce Clause.  And *Northwest Austin*'s statement that equal sovereignty may yield when local evils appear was made immediately after the statement that regulatory "[d]istinctions can be justified in *some* cases."  557 U.S. at 203 (emphasis added).  Thus, local evils appear to be but *one* of the types of cases in which a departure from the equal sovereignty principle is permitted.

Third, there is nothing in *Shelby County* to indicate that the equal sovereignty principle is meant to apply with the same force outside the context of "sensitive areas of state and local policymaking." *Shelby County*, 133 S. Ct. at 2624. We "had best respect what the [Court's] majority says rather than read between the lines. . . . If the Justices are pulling our leg, let them say so." *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 448 (7th Cir. 1992).

Fourth, even accepting that the equal sovereignty principle applies in the same manner in the context of Commerce Clause legislation, we have no trouble concluding that PASPA passes muster. Appellants' argument that PASPA's exemption does not properly remedy local evils because it "target[ed] the States in which legal sports wagering was absent," N.J. Br. at 56 (emphasis omitted), again distorts PASPA's purpose as being to wipe out sports gambling altogether. When the true purpose is considered—

99

to stop the *spread* of *state-sanctioned* sports gambling—it is clear that regulating states in which sports-wagering already existed would have been irrational. Targeting only states where the practice did not exist is thus more than sufficiently related to the problem, it is *precisely tailored* to address the problem. If anything, Appellants' quarrel seems to be with PASPA's actual goal rather than with the manner in which it operates.

Finally, Appellants ignore another feature that distinguishes PASPA from the VRA—that far from singling out a handful of states for disfavored treatment, PASPA treats *more favorably* a *single* state. Indeed, it is noteworthy that Appellants do not ask us to invalidate § 3704(a)(2), the Nevada grandfathering provision that supposedly creates the equal sovereignty problem. Instead, we are asked to strike down § 3702, PASPA's general prohibition on state-licensed sports gambling. Appellants do not explain why, if PASPA's

preferential treatment of Nevada violates the equal-sovereignty doctrine, the solution is not to strike down only that exemption. The remedy New Jersey seeks—a complete invalidation of PASPA—does far more violence to the statute, and would be a particularly odd result given the law's purpose of curtailing state-licensed gambling on sports. That New Jersey seeks Nevada's preferential treatment, and not a complete ban on the preferences, undermines Appellants' invocation of the equal sovereignty doctrine.

### 2. Grandfathering Clause Cases

Appellants also argue that PASPA's exemption for Nevada is invalid under the Supreme Court's analysis in *City of New Orleans v. Dukes*, 427 U.S. 297 (1976), and *Minnesota v. Clover Leaf Creamery*, 449 U.S. 456 (1981), of grandfathering provisions in economic legislation. But in both cases the Supreme Court *upheld* the provisions: in *Dukes*, an ordinance that banned push cart vendors from New

Orleans' historic district, but grandfathered those of a certain vintage, 427 U.S. at 305; in *Clover Leaf*, a statute banning the sale of milk in non-recyclable containers but grandfathering non-recyclable paper containers, 449 U.S. at 469.

Two cases upholding economic ordinances aimed at private parties have little to say about state sovereignty. While Appellants contend that *Dukes* and *Clover Leaf Creamery* support their position because they upheld *temporary* grandfathering clauses, there was no indication in either case that the clauses upheld were indeed temporary, that the legislatures were obligated to rescind them in the future, or even that the supposedly temporal quality of the laws was the basis of the Court's holdings, other than a statement in passing in *Dukes* that the legislature had chosen

to "initially" target only a particular class of products. 427

U.S. at 305.[18]

Appellants note that there is no case where a court has

"permitted a grandfathering rationale to serve as a

justification for violating the fundamental principle of equal

sovereignty." N.J. Br. at 59. But it is not hard to see why this

is the case: only two Supreme Court cases in modern times

have applied the equal sovereignty principle.[19]

---

[18] Nor does our decision in *Delaware River Basin Commission v. Bucks County Water & Sewer Authority* support the notion that permanent grandfathering clauses are invalid, given that in that case we simply remanded for development of a record as to why the law at issue contained a grandfathering provision. 641 F.2d 1087, 1096-98 (3d Cir. 1981). PASPA's legislative history is clear as to the purpose behind its own exemptions, and thus survives *Delaware River Basin*.

[19] Appellants also rely on the so-called "equal footing" principle, the notion that Congress may not burden a new state's entry into the Union by disfavoring them over other states in support of their attack on Nevada's exemption. *See, e.g.*, *Escanaba & Lake Mich. Transp. v. Chicago*, 107 U.S. 678, 689 (1883) (explaining that whatever restriction may

# V. <u>CONCLUSION</u>

If baseball is a game of inches, constitutional adjudication may be described as a matter of degrees. The questions we have addressed are in many ways *sui generis*. Neither the standing nor the merits issues we have tackled permit an easy solution by resorting to a controlling case that provides a definitive "Eureka!" moment. Our role thus is to distill an answer from precedent and the principles embodied therein. But we are confident that our adjudication of this dispute and our resolution of its merits leave us well within the strict bounds set forth by the Constitution and preserves intact the state-federal balance of power.

---

have been imposed over Illinois' ability to regulate the operation of bridges over the Chicago River, such restrictions disappeared once Illinois was admitted into the Union as a state); *Coyle*, 221 U.S. at 567 (holding that Congress may not require Oklahoma to not change its capital as a condition of admission into the Union). But PASPA does not speak to conditions of admission into the Union.

Having examined the difficult legal issues raised by the parties, we hold that nothing in PASPA violates the U.S. Constitution. The law neither exceeds Congress' enumerated powers nor violates any principle of federalism implicit in the Tenth Amendment or anywhere else in our Constitutional structure. The heart of Appellants' constitutional attack on PASPA is their reliance on two doctrines that—while of undeniable importance—have each only been used to strike down notably intrusive and, indeed, extraordinary federal laws. Extending these principles as Appellants propose would result in significant changes to the day-to-day operation of the Supremacy Clause in our constitutional structure. Moreover, we see much daylight between the exceedingly intrusive statutes invalidated in the anti-commandeering cases and PASPA's much more straightforward mechanism of stopping the states from lending their imprimatur to gambling on sports.

New Jersey and any other state that may wish to legalize gambling on sports within their borders are not left without redress. Just as PASPA once gave New Jersey preferential treatment in the context of gambling on sports, Congress may again choose to do so or, more broadly, may choose to undo PASPA altogether. It is not our place to usurp Congress' role simply because PASPA may have become an unpopular law. The forty-nine states that do not enjoy PASPA's solicitude may easily invoke Congress' authority should they so desire.

The District Court's judgment is AFFIRMED.

*Nat'l Collegiate Athletic Ass'n, et al. v. Governor of the State of N.J., et al.*, Nos. 13-1713, 13-1714, 13-1715

VANASKIE, *Circuit Judge*, concurring in part and dissenting in part.

I agree with my colleagues that the Leagues have standing to challenge New Jersey's Sports Wagering Law, N.J. Stat. Ann. § 5:12A-2, and that the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3702, does not violate the principle of "equal sovereignty." I therefore join parts III and IV.C of the majority's decision in full. I also agree that, ordinarily, Congress has the authority to regulate gambling pursuant to the Commerce Clause, and thus I join part IV.A of the majority opinion as well. Yet, PASPA is no ordinary federal statute that directly regulates interstate commerce or activities substantially affecting such commerce. Instead, PASPA prohibits states from authorizing sports gambling and thereby directs how *states* must treat such activity. Indeed, according to my colleagues, PASPA essentially gives the states the choice of allowing totally unregulated betting on sporting events or prohibiting all such gambling. Because this congressional directive violates the principles of federalism as articulated by the Supreme Court in *United States v. New York*, 505 U.S. 142 (1992), and *Printz v. United States*, 521 U.S. 898 (1997), I respectfully dissent from that part of the majority's opinion that upholds PASPA as a constitutional exercise of congressional authority.

## I.

I agree with my colleagues that an appropriate starting point for addressing Appellants' claims is *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S.

1

264 (1981). In *Hodel*, the Court reviewed the constitutionality of the federal Surface

Mining Control and Reclamation Act, a comprehensive statutory scheme designed to

regulate against the harmful effects of surface coal mining. *Id.* at 268. The act permitted

states that wished to exercise permanent regulatory authority over surface coal mining to

submit plans that met federal standards for federal approval. *Id.* at 271. In addition, the

federal government created a federal enforcement program for states that did not obtain

federal approval for state plans. *Id.* at 272. Applying the framework set forth in the

since-overruled case, *National League of Cities v. Usery*, 426 U.S. 833 (1976), *overruled

by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985), the Court

concluded that the act did not regulate "'States as States'" because the challenged

provisions governed only private individuals' and business' activities and because "the

States are not compelled to enforce the . . . standards, to expend any state funds, or to

participate in the federal regulatory program in any manner whatsoever." *Id.* at 287-88.

The Court further explained that

> [i]f a State does not wish to submit a proposed permanent
> program that complies with the Act and implementing
> regulations, the full regulatory burden will be borne by the
> Federal Government. Thus, there can be no suggestion that
> the Act commandeers the legislative processes of the States
> by directly compelling them to enact and enforce a federal
> regulatory program.

*Id.* at 288. Even post-*Garcia*, the Court has explained that the act at issue in *Hodel*

presented no Tenth Amendment problem "because it merely made compliance with

federal standards a precondition to continued state regulation in an otherwise pre-empted

field." *Printz*, 521 U.S. at 926.

2

As the majority points out, a year later, in *FERC v. Mississippi*, 456 U.S. 742 (1982), the Court upheld the constitutionality of two titles of the Public Utility Regulatory Policies Act ("PURPA"), which directed state regulatory authorities to "consider" certain standards and approaches to regulate energy and prescribed certain procedures, but did not require the state authorities to adopt or implement specified standards. *Id.* at 745-50. As in *Hodel*, the Court observed that Congress had authority to preempt the field at issue—in *FERC*'s case, energy regulation. *Id.* at 765. The Court explained:

> PURPA should not be invalid simply because, out of deference to state authority, Congress adopted a less intrusive scheme and allowed the States to continue regulating in the area on the condition that they *consider* the suggested federal standards. While the condition here is affirmative in nature— that is, it directs the States to entertain proposals—nothing in this Court's cases suggests that the nature of the condition makes it a constitutionally improper one. There is nothing in PURPA "directly compelling" the States to enact a legislative program. In short, because the two challenged Titles simply condition continued state involvement in a pre-emptible area on the consideration of federal proposals, they do not threaten the States' "separate and independent existence," *Lane County v. Oregon*, 7 Wall. 71, 76, 19 L.Ed. 101 (1869); *Coyle v. Oklahoma*, 221 U.S. 559, 580, 31 S.Ct. 688, 695, 55 L.Ed. 853 (1911), and do not impair the ability of the States "to function effectively in a federal system." *Fry v. United States*, 421 U.S., at 547, n.7, 95 S.Ct., at 1795, n.7; *National League of Cities v. Usery*, 426 U.S., at 852, 96 S.Ct., at 2474. To the contrary, they offer the States a vehicle for remaining active in an area of overriding concern.

*Id.* at 765-66.

Subsequently, the Supreme Court struck down provisions in two cases based on violations of federalism principles. At issue in the first case, *New York*, was a federal

3

statute that intended to incentivize "States to provide for the disposal of low level radioactive waste generated within their borders." *New York*, 505 U.S. at 170. As "an alternative to regulating pursuant to Congress' direction," one of the "incentives" provided states the "option of taking title to and possession of the low level radioactive waste . . . and becoming liable for all damages waste generators suffer[ed] as a result of the State's failure to do so promptly." *Id.* at 174-75. At the outset, the Court characterized the issue before it as "concern[ing] the circumstances under which Congress may use the State as implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way." *Id.* at 161.

The Court in *New York* held the "take title" provision unconstitutional because it "'commandeer[ed] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program'" in violation of the principles of federalism. *Id.* at 176 (quoting *Hodel*, 452 U.S. at 288). The Court explained that "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, *it lacks the power directly to compel the States to require or prohibit those acts.*" *Id.* at 166 (emphasis added). It further elaborated that "[t]he allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; *it does not authorize Congress to regulate state governments' regulation of interstate commerce.*" *Id.* (emphasis added).

Second, in *Printz*, the Court reviewed a temporary federal statutory provision that required certain state law enforcement officers to conduct background checks on

4

potential handgun purchasers as part of a federal regulatory scheme. *Printz*, 521 U.S. at 903-04. Observing that "'[t]he Federal Government may not compel the States to enact or administer a federal regulatory program,'" *id.* at 933 (quoting *New York*, 505 U.S. at 188), the Court held that "Congress cannot circumvent that prohibition by conscripting the State's officers directly." *Id.* at 935. The Court further explained that Congress categorically "may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.*

Later, in *Reno v. Condon*, 528 U.S. 141 (2000), a case the majority regards as "remarkably similar" to the matter *sub judice*, (Maj. Op. 43), a unanimous Court held that the Driver's Privacy Protection Act ("DPPA"), a generally applicable law which regulates the disclosure and resale by states and private persons of personal information contained in state department of motor vehicle records, "did not run afoul of the federalism principles enunciated in *New York* . . . and *Printz*." *Id.* at 143, 146, 151. After first determining that the DPPA was a proper exercise of congressional authority under the Commerce Clause, the Court rejected South Carolina's argument that the act violated federalism principles because it would "require time and effort on the part of state employees." *Id.* at 148, 150. Finding *New York* and *Printz* inapplicable, the Court relied instead on *South Carolina v. Baker*, 485 U.S. 505 (1988),[1] which "upheld a statute that prohibited States from issuing unregistered bonds because the law 'regulate[d] state

---

[1] The majority also characterizes *Baker* as "remarkably similar" to PASPA's prohibition of state action. (Maj. Op. 43.)

activities,' rather than 'seeking[ing] to control or influence the manner in which States regulate private parties.'" *Reno*, 528 U.S. at 150 (quoting *Baker*, 485 U.S. at 514-15).[2] The Court further explained:

> The DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the owners of data bases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals.

*Id.* at 151.

Most recently, in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012), the Court struck down, as violative of the Spending Clause, a provision in the Patient Protection and Affordable Care Act ("ACA") that would have withheld federal Medicaid grants to states unless they expanded their Medicaid eligibility requirements in accordance with conditions in the ACA. *Id.* at 2581-82, 2606-07

---

[2] In *Baker*, the Court observed:

> The [intervenor] nonetheless contends that § 310 has commandeered the state legislative and administrative process because many state legislatures had to amend a substantial number of statutes in order to issue bonds in registered form and because state officials had to devote substantial effort to determine how best to implement a registered bond system. Such "commandeering" is, however, an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.

*Baker*, 485 U.S. at 514-15.

6

(plurality). Quoting *New York*, Chief Justice Roberts, writing for a three-justice plurality, observed that "'the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.'" *Id.* at 2602 (quoting *New York*, 505 U.S. at 162). The plurality then explained that, based on that principle, *New York* and *Printz* had struck down federal statutes that "commandeer[ed] a State's legislative or administrative apparatus for federal purposes." *Id.* The plurality also noted that, within the authority of the Spending Clause, Congress may not create "inducements to exert a power akin to undue influence" where "pressure [would] turn[] into compulsion." *Id.* (internal quotations omitted). Recognizing that "'[t]he Constitution simply does not give Congress the authority to require the States to regulate,'" the plurality observed that "[t]hat is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system of its own." *Id.* (quoting *New York*, 505 U.S. at 178). The plurality ultimately concluded that the Medicaid conditions were unduly coercive and reiterated that "Congress may not simply 'conscript state [agencies] into the national bureaucratic army.'" *Id.* at 2604, 2606-07 (quoting *FERC*, 456 U.S. at 775 (O'Connor, J., concurring in judgment in part and dissenting in part)).

While Chief Justice Roberts' opinion concerning the Medicaid expansion provisions in *Sebelius* garnered the signatures of only three justices, the four dissenting justices also invoked the federalism principles of *New York* in concluding that the funding conditions in the Medicaid expansion impermissibly compelled states to govern as directed by Congress by coercing states' participation in the expanded program. *Id.* at

7

2660-62 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). Thus, seven justices

found the Medicaid expansion unconstitutional, citing the federalism principles

articulated in *New York* as part of the basis for their conclusion. Importantly, the seven-

justice rejection of the Medicaid expansion based, in part, on *New York*, represents a clear

signal from the Court that the principles enunciated in *New York* are not limited to a

narrow class of cases in which Congress specifically directs a state legislature to

affirmatively enact legislation. *Cf. United States v. Richardson*, 658 F.3d 333, 340 (3d

Cir. 2011) (observing that even if not binding due to the votes of a splintered Court, "the

collective view of [a majority of] justices is, of course, persuasive authority").

## II.

*New York* and *Printz* clearly established that the federal government cannot direct

state legislatures to enact legislation and state officials to implement federal policy. It is

true that the two particular statutes under review in those cases involved congressional

commands that states affirmatively enact legislation, *see New York*, 505 U.S. at 176-77,

or affirmatively enforce a federal regulatory scheme, *see Printz*, 521 U.S. at 935.

Nothing in *New York* or *Printz*, however, limited the principles of federalism upon which

those cases relied to situations in which Congress directed affirmative activity on the part

of the states. Rather, the general principle articulated by the Court in *New York* was that

> even where Congress has the authority under the Constitution
> to pass laws requiring or prohibiting certain acts, it lacks the
> power directly to compel the States to require *or prohibit*
> *those acts*. The allocation of power contained in the
> Commerce Clause, for example, authorizes Congress to
> regulate interstate commerce directly; *it does not authorize*

8

> *Congress to regulate state governments' regulation of interstate commerce.*

*New York*, 505 U.S. at 166 (emphasis added) (citations omitted).  Here, it cannot be disputed that PASPA "regulate[s] state governments' regulation of interstate commerce." *See id.*  States regulate gambling, in part, by licensing or authorizing such activity.  By prohibiting states from licensing or authorizing sports gambling, PASPA dictates the manner in which states must regulate interstate commerce and thus contravenes the principles of federalism set forth in *New York* and *Printz.*[3]

If the objective of the federal government is to require states to regulate in a manner that effectuates federal policy, any distinction between a federal directive that commands states to take affirmative action and one that prohibits states from exercising their sovereignty is illusory.  Whether stated as a command to engage in specific action or as a prohibition against specific action, the federal government's interference with a state's sovereign autonomy is the same.  Moreover, the recognition of such a distinction is untenable, as affirmative commands to engage in certain conduct can be rephrased as a prohibition against not engaging in that conduct.  Surely the structure of Our Federalism does not turn on the phraseology used by Congress in commanding the states how to

---

[3] I agree with my colleagues that Congress has the authority under the Commerce Clause to ban gambling on sporting events, and that such a ban could include state-licensed gambling.  I part company with my colleagues because that is not what PASPA does.  Instead, PASPA conscripts the states as foot soldiers to implement a congressional policy choice that wagering on sporting events should be prohibited to the greatest extent practicable.  Contrary to the majority's view, the Supremacy Clause simply does not give Congress the power to tell the states what they can and cannot do in the absence of a validly-enacted federal regulatory or deregulatory scheme.  As explained at pages 13-14, *infra,* there is no federal regulatory or deregulatory scheme on the matter of sports wagering.  Instead, there is the congressional directive that states not allow it.

regulate. An interpretation of federalism principles that permits congressional negative commands to state governments will eviscerate the constitutional lines drawn in *New York* and *Printz* that recognized the limit to Congress's power to compel state instrumentalities to carry out federal policy.

In addition, PASPA implicates the political accountability concerns voiced by the Supreme Court in *New York* and *Printz*. In *New York*, the Court observed that when the federal government preempts an area with a federal law to impose its view on an issue, it "makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular." *New York*, 505 U.S. at 168. In contrast, the Court explained, "where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *Id.* at 169. The Court also recognized in *Printz* that in situations where Congress compels state officials to "implement[] a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes" and that states "are . . . put in the position of taking the blame for [the federal program's] burdensomeness and for its defects." *Printz*, 521 U.S. at 930. Although PASPA does not "direct[] the States to regulate," *New York*, 505 U.S. at 169, or "implement[] a federal regulatory program," *Printz*, 521 U.S. at 930, its prohibition on state authorization and licensing of sports gambling similarly diminishes the accountability of federal officials at the expense of state officials. Instead of directly

10

regulating or banning sports gambling, Congress passed the responsibility to the states, which, under PASPA, may not authorize or issue state licenses for such activities. New Jersey law regulates games of chance, *see* N.J. Stat. Ann. § 5:8-1, *et seq.*, state lotteries, *see id.* § 5:9-1, *et seq.*, and casino gambling within the state, *see id.* § 5:12-1, *et seq.* As a result, it would be natural for New Jersey citizens to believe that state law governs sports gambling as well. That belief would be further supported by the fact that the voters of New Jersey recently passed a state constitutional amendment permitting sports gambling and their representatives in the state legislature subsequently enacted the Sports Wagering Law, at issue here, to regulate such activity. When New Jersey fails to authorize or license sports gambling, its citizens will understandably blame state officials even though state regulation of gambling has become a puppet of the federal government, whose strings are in reality pulled (or cut) by PASPA. States can authorize and regulate some forms of gambling, e.g., lotteries and casinos, but not other forms of gambling to implement policy choices made by Congress. Thus, accountability concerns arising from PASPA's restraint on state regulation also counsel in favor of concluding that it violates principles of federalism.

I do not suggest that the federal government may not prohibit certain actions by state governments—indeed it can. If Congress identifies a problem that falls within its realm of authority, it may provide a federal solution directly itself or properly incentivize states to regulate or comply with federal standards. For example, if Congress chooses to regulate (or deregulate) directly, it may require states to refrain from enacting their own regulations that, in Congress's judgment, would thwart its policy objectives. Illustrating

11

this point, the Supreme Court held in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), that the federal Airline Deregulation Act, which "prohibit[ed] the States from enforcing any law 'relating to rates, routes, or services' of any air carrier" preempted guidelines regarding fair advertising set forth by an organization of state attorneys general. *Id.* at 378-79, 391. There, as the Court explained, the purpose of the federal prohibition against further state regulation was "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Id.* at 378. Thus, a state law contrary to a federal regulatory or deregulatory scheme is void under the Supremacy Clause.[4]

Unlike in *Morales* and other preemption cases in which federal legislation limits the actions of state governments, in this case, there is no federal scheme regulating or deregulating sports gambling by which to preempt state regulation. PASPA provides no federal regulatory standards or requirements of its own. Instead, it simply prohibits states from "sponsor[ing], operat[ing], advertis[ing], promot[ing], licens[ing], or authoriz[ing]" gambling on sports. 28 U.S.C. § 3702(1). And, PASPA certainly cannot be said to be a deregulatory measure, as its purpose was to stem the spread of state-sponsored sports gambling, not let it go unregulated.[5] *See* S. Rep. No. 102-248, at 3 (1991) ("The purpose

---

[4] Significantly, the majority opinion does not cite any case that sustained a federal statute that purported to regulate the states under the Commerce Clause where there was no underlying federal scheme of regulation or deregulation. In this sense, PASPA stands alone in telling the states that they may not regulate an aspect of interstate commerce that Congress believes should be prohibited.

[5] The majority reasons that PASPA does not commandeer the states in battling sports gambling because the states retain the choice of repealing their laws outlawing

of S. 474 is to prohibit sports gambling conducted by, or authorized under the law of, any State or other governmental entity."); *id.* at 4 ("Senate bill 474 serves an important public purpose, to stop the spread of State-sponsored sports gambling . . . .").

Moreover, contrary to the majority opinion's suggestion, other federal statutes relating to sports gambling do not aggregate to form the foundation of a federal regulatory scheme that can be interpreted as preempting state regulation of sports gambling. First, Section 1084 of Title 18 of the United States Code makes it a federal crime to use wire communications to transmit sports bets in interstate commerce unless the transmission is from and to a state where sports betting is legal. *See* 18 U.S.C. § 1084(a)-(b). Thus, under that section, state law, rather than federal law, determines whether the specified conduct falls within the criminal statute.[6] Second, another federal law prohibits any "scheme . . . to influence . . . by bribery any sporting contest." *Id.* § 224(a). But, that same section expressly indicates that it "shall not be construed as indicating an intent on the part of Congress to occupy the field in which this section operations to the exclusion of any State," and further disavows any attempt to preempt otherwise valid state laws. *Id.* § 224(b). A third federal statute carves out an exception to the general federal prohibition against transporting or mailing material and broadcasting information relating to lotteries for those conducted or authorized by states. *Id.* §

such activity, observing that PASPA does not "*require*[] that the states keep any law in place." (Maj. Op. at 39.) Contrary to the majority's supposition, it certainly is open to debate whether a state's repeal of a ban on sports gambling would be akin to that state's "authorizing" gambling on sporting events, action that PASPA explicitly forecloses.

[6] Accordingly, if a state repealed an existing ban on wagering on sporting events, federal law would not be implicated.

13

1307(a)-(b). That exception, however, does not pertain to the transportation or mailing of "equipment, tickets, or material" for sports lotteries. *Id.* § 1307(b), (d). Thus, while state sports lotteries violate § 1307, that section does not provide a basis for inferring that it, together with PAPSA, provides a federal regulatory scheme that preempts state regulation of sports gambling by private parties.[7] Further indicating federal deference to state laws on the subject, a fourth federal statute makes it a crime to transport wagering paraphernalia in interstate commerce but does not apply to betting materials to be used on sporting events in states where such betting is legal. *Id.* § 1953(a)-(b). As a result, the federal prohibition of state-authorized sports gambling does not emanate from a federal regulatory scheme that expressly or implicitly preempts state regulation that would conflict with federal policy. Instead, PASPA attempts to implement federal policy by telling the states that they may not regulate an otherwise unregulated activity. The Constitution affords Congress no such power. *See New York*, 505 U.S. at 178 ("The Constitution . . . gives Congress the authority to regulate matters directly and to pre-empt contrary state regulation. Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly . . . .").

In addition to preempting state regulation with federal regulation, in some circumstances, Congress may regulate states directly as part of a generally applicable law. *See, e.g.*, *New York*, 505 U.S. at 160 (collecting cases). That is what Congress did

---

[7] PASPA only extends its prohibition to private persons to the extent persons "sponsor, operate, advertise, or promote [sports gambling] pursuant to the law or compact of a governmental entity." 28 U.S.C. § 3702(2). Because the federal statute applies only to persons who act pursuant to state law, it cannot be said to directly regulate persons.

14

with the DPPA, which the Court expressly found in *Reno* to be generally applicable. *See Reno*, 528 U.S. at 151 ("[W]e need not address the question whether general applicability is a constitutional requirement for federal regulation of the States, because the DPPA is generally applicable. The DPPA regulates the universe of entities that participate as suppliers to the market for motor vehicle information . . . ."). Yet, unlike the DPPA in *Reno*, but like the act in *New York*, PASPA is not an example of a generally applicable law that subjects states to the same federal regulation as private parties. *See New York*, 505 U.S. at 160 ("This litigation presents no occasion to apply or revisit the holdings of . . . cases [concerning generally applicable laws], as this is not a case in which Congress has subjected a State to the same legislation applicable to private parties."). In addition to its restrictions on actions by state governments relating to sports gambling, PASPA also forbids "a person to sponsor, operate, advertise, or promote" sports gambling if done "*pursuant to the law or compact of a governmental entity*." 18 U.S.C. § 3702(2) (emphasis added); *see also supra* note 2. Thus, PASPA's reach to private parties is predicated on a state's authorization of sponsorship, operation, advertisement, or promotion of sports gambling pursuant to state law.[8] Accordingly, PASPA cannot be said to "subject[] . . . States[s] to the same legislation applicable to private parties," *New York*, 505 U.S. at 160, for state law determines whether § 3702(2) reaches any particular individual.

---

[8] According to the majority, a state would presumably not run afoul of PASPA if it merely refused to prohibit sports gambling. The resulting unregulated market, however, portends grave consequences for which state officials would be held accountable, even though it would be federal policy that prohibits the states from taking effective measures to regulate and police this activity. In this sense, PASPA is indeed coercive.

15

Nor does *Reno* stand more generally for the proposition that a violation of "anti-commandeering" federalism principles occurs only when Congress requires affirmative activity by state governments. It is true that in upholding the DPPA, the Court noted that it "d[id] not require the South Carolina Legislature to enact any laws or regulations, and it d[id] not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno*, 528 U.S. at 151. Read in context, however, that statement does not suggest that the principles of federalism articulated in *New York* and *Printz* are limited only to situations in which Congress compels states to enact laws or enforce federal regulation. The two sentences preceding that statement make that clear. First, the Court recognized that "the DPPA d[id] not require the States in their sovereign capacity to regulate their own citizens." *Id.* But here, PASPA *does* "require states in their sovereign capacity to regulate their own citizens," *id.*, because it dictates *how* they must regulate sports gambling. Pursuant to PASPA, states may not "sponsor, operate, advertise, promote, license, or authorize" such activity, 28 U.S.C. § 3702(1). Thus, states must govern accordingly, even if that means by refraining from providing a regulatory scheme that governs sports gambling.

Second, the Court explained in *Reno* that, "[t]he DPPA regulates the States *as owners* of data bases" of personal information in motor vehicle records. *Reno*, 528 U.S. at 151 (emphasis added). The fact that the DPPA regulated states as "suppliers to the market for motor vehicle information," *id.*, clearly indicates that the Court viewed the DPPA as direct congressional regulation of interstate commerce, *id.* at 148 (recognizing that motor vehicle information, in the context of the DPPA, is "an article of commerce"),

16

rather than a federal requirement for the states to regulate such activity, *see New York*, 505 U.S. at 166 ("The allocation of power contained in the Commerce Clause . . . authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.").  Although the Court declined to find that *New York* and *Printz* governed the DPPA merely because it would "require time and effort on the part of state employees," it clarified that federally mandated action by states to comply with federal regulations is not necessarily fatal to a federal law that "'regulate[s] state activities,' rather than 'seek[ing ] to control or influence the manner in which States regulate private parties.'"  *Reno*, 528 U.S. at 150 (quoting *Baker*, 485 U.S. at 514-15) (second alteration in original).

The direct federal regulation of interstate commerce under the DPPA obviously distinguishes *Reno* from *New York* and *Printz*, where the federal statutes at issue in those cases required states to enact legislation and enforce federal policy, respectively.  But it also distinguishes *Reno* from this case.  As the Court recognized, "[t]he DPPA establishe[d] a regulatory scheme."  *Reno*, 528 U.S. at 144, 148, 151.  As discussed above, however, PASPA is not itself a regulatory scheme, nor does it combine with several other scattered statutes in the criminal code to create a federal regulatory scheme.  And while Congress could have regulated sports gambling directly under the Commerce Clause, just as it regulated motor vehicle information under the DPPA, it did not.  Instead, it chose to set federal parameters as to how states may regulate sports gambling.  As a result, any reliance on *Reno* to uphold PASPA is misplaced.

*Hodel* and *FERC* also provide no support for upholding PASPA. In *Hodel*, the statute at issue permitted states to submit a state regulatory plan for federal approval if they wished to regulate surface coal mining; if states did not seek or obtain approval, then a federal enforcement program would take effect. *Hodel*, 452 U.S. at 271-72. The Court determined that the federal statute did not "commandeer[] the legislative process of the States" because states had a choice about whether to implement regulation that conformed to federal standards or let the federal government bear the burden of regulation. *Id.* at 288; *see also Printz*, 521 U.S. at 925-26 ("In *Hodel* . . . we concluded that the Surface Mining Control and Reclamation Act of 1977 did not present [a Tenth Amendment] problem . . . because it merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field." (citation omitted)). If PASPA provided a similar choice to states—to either implement state regulation of sports gambling that met federal standards or allow federal regulation to take effect—then perhaps it would pass constitutional muster. But it does not. Therefore *Hodel* is inapplicable to the case at hand.

In addition, in upholding Titles I and III of PURPA in *FERC*, the Court focused on the fact that those titles merely required that states "*consider* the suggested federal standards" as a condition to continued state regulation. *FERC*, 456 U.S. at 765; *see also id.* at 765-66 ("In short, because the two challenged Titles simply condition continued state involvement in a pre-emptible area on the consideration of federal proposals, they do not threaten the States' separate and independent existence, and do not impair the ability of the States to function effectively in a federal system." (citations omitted)

18

(internal quotation marks omitted)). Here, PASPA does not provide suggested federal standards and approaches that states must consider in their regulation of sports gambling. Rather, PASPA strips any regulatory choice from state governments.[9] Furthermore, while the PURPA titles in *FERC* did "not involve the compelled exercise of Mississippi's sovereign powers," *id.* at 769, PASPA does indeed suffer from the obverse of such a constitutional defect: it prohibits the exercise of states' sovereign powers. *FERC* is thus distinguishable and inapposite.

Finally, as recognized by the majority, our decision in *Office of the Commissioner of Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009), does not bind us to reject a challenge to PASPA on federalism grounds. In that case, we determined that a statutory phrase concerning the extent to which states grandfathered under PASPA could operate certain types of sports gambling was unambiguous. *Id.* at 302-03. As a result of the unambiguous language in PASPA, "we f[ou]nd unpersuasive Delaware's argument that its sovereign status requires that it be permitted to implement its proposed betting scheme." *Id.* at 303. That finding, however, related to our conclusion that PASPA gave clear notice of its "'alter[ation] [of] the usual constitutional balance' with respect to sports wagering," and thus satisfied the requirement of *Gregory v. Ashcroft*, 501 U.S. 452 (1991). *See Markell*, 579 F.3d at 303. Yet, here, we are not dealing with a question of

---

[9] The majority asserts that the two "choices" presented to a state by PASPA – to "repeal its sports wagering ban [or] to keep a complete ban on sports wagering" – "leave much room for the states to make their own policy." (Maj. Op. at 41.) Even if the majority's reading of PASPA as affording these choices is correct, I fail to discern the "room" that is accorded the states to make their own policy on sports wagering. It seems to me that the only choice is to allow for completely unregulated sports wagering (a result that Congress certainly did not intend to foster), or to ban sports wagering completely.

which sovereign—state or federal—has the authority under either the "usual" or "altered" constitutional balance to regulate sports gambling. Congress does have the authority to regulate sports gambling when it does so itself. In this case, however, we are faced with the issue of whether Congress has the authority to regulate how states regulate sports gambling. Thus, our rejection of Delaware's "sovereign status" argument has no bearing on the issue before us. Furthermore, *Markell* provides no guidance in this case, because there we addressed only the meaning of the statutory exception to PASPA relating to grandfathered states found at 28 U.S.C. § 3704(a)(1). *Markell*, 579 F.3d. at 300-01. We did not pass upon the issue of whether Congress may constitutionally restrict how states can regulate under § 3702(1).

In sum, no case law supports permitting Congress to achieve federal policy objectives by dictating how states regulate sports gambling. Instead of directly regulating state activities or interstate commerce, PASPA "seek[s] to control or influence the manner in which States regulate private parties," a distinction the Supreme Court has recognized as significant. *See Reno*, 528 U.S. at 150 (internal quotation marks omitted) ("In *Baker*, we upheld a statute that prohibited States from issuing unregistered bonds because the law 'regulate[d] state activities,' rather than 'seek[ing] to control or influence the manner in which States regulate private parties.'" (quoting *Baker*, 485 U.S. at 514-15)); *see also New York*, 505 U.S at 166 ("The allocation of power contained in the Commerce Clause . . . authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.").

20

Moreover, no legal principle exists for finding a distinction between the federal government compelling state governments to exercise their sovereignty to enact or enforce laws on the one hand, and restricting state governments from exercising their sovereignty to enact or enforce laws on the other. In both scenarios the federal government is regulating how *states* regulate. If Congress identifies a problem involving or affecting interstate commerce and wishes to provide a policy solution, it may regulate the commercial activity itself, *see New York*, 505 U.S. at 166, and may even regulate state activity that involves interstate commerce, *see Reno*, 528 U.S. at 150-51; *Baker*, 485 U.S. at 514. In addition, Congress may provide states a choice about whether to implement state regulations consistent with federal standards or let federal regulation preempt state law, *see Hodel*, 452 U.S. at 288, and may require states to "consider" federal standards or approaches to regulation in deciding how to regulate in a preemptible area, *see FERC*, 456 U.S. at 765-66. Furthermore, Congress may "encourage a State to regulate in a particular way," *New York*, 505 U.S. at 166,—even in areas outside the scope of Congress's Article I, § 8 powers—by "attach[ing] conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). But, what Congress may not do is "regulate state governments' regulation." *See New York*, 505 U.S. at 166. Whether commanding the use of state machinery to regulate or commanding the nonuse of state machinery to regulate, the Supreme Court "has been explicit" that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id.* at 162. Because that is exactly what PASPA does here, I conclude it violates the principles of federalism articulated in *New York* and

21

*Printz*. Therefore, I would reverse the District Court's order granting summary judgment for Plaintiffs and vacate the permanent injunction.